## J. S. FARREN & CO. *vs.* DAMERON & BAILEY.

*Sales—When no Implied Warranty Against Latent Defects—Bloody Oysters—Caveat Emptor.*

In the absence of an express warranty, the seller of goods, who is not the manufacturer thereof, is not liable for latent and hidden defects, which develop after the goods have been inspected and accepted by the buyer.

Plaintiffs, dealers in oysters which they purchased from dredgers, agreed to sell and ship to the defendant shucked oysters during a certain season. The oysters were shipped in plaintiffs' kegs, emptied by defendant into his own vessels and by him re-sold. This action was brought to recover the price of two shipments for which defendant refused to pay on the ground that these oysters were unmerchantable. The oysters in question when shipped by the plaintiffs and when received by the defendant appeared to be in good condition. They were re-packed by the defendant and shipped to distant parties by whom they were rejected because they had become "red" or "bloody" oysters. The evidence showed that in many cases this defect or disease does not develop until some days after the oysters are shucked, and that a comparatively small number of red oysters will infect all the others packed with them in a pail, also that defendant had included in these shipments some oysters not purchased from the plaintiffs. *Held*, that under these circumstances there was no implied warranty by plaintiffs that the oysters sold by them, being merchantable at the time of delivery, were free from latent defects, and that since defendant had accepted these oysters after inspecting them he is liable for the price thereof.

Appeal from the Court of Common Pleas (Dobler, J.)

The cause was argued before McSherry, C. J., Fowler, Boyd, Pearce, Schmucker and Jones, JJ.

*Vernon Cook* (with whom were *Gans & Haman* on the brief), for the appellant.

Our proposition of law is that while the doctrine of *caveat emptor* does properly apply to sales of specific existing chattels, where the vendee has an opportunity to examine the goods before he enters into the contract of sale, that it has no application to a case where one orders goods to be supplied

and delivered him by a dealer in such articles. In such case, we contend that when the order is accepted it becomes an implied term of the contract that the goods to be furnished shall at least be merchantable, free from defects, latent or patent, which interfere with its merchantability; not that they shall be of any particular degree of fineness or adapted for any special purpose the vendee may have in mind, and not known to the vendor, but at least a merchantable article.

The distinction between the two classes of cases is well stated in *Benjamin on Sales*, 7 ed., sec. 645, or 3 ed., sec. 852, as follows (the italics are the authors): "So far as an ascertained specific chattel, *already existing* and *which the buyer has inspected* is concerned, the rule of *caveat emptor* admits of no exception by implied warranty of quality." "But where a chattel is to be made or supplied to the order of the purchaser, there is an implied warranty that it is reasonably fit for the purpose for which it is ordinarily used, or that it is fit for the special purpose intended by the buyer, if that purpose be comunicated to the vendor when the order is given." Again in sec. 873B, "Where a manufacturer or a dealer contracts to supply an article which he manufactures, or produces, or in which he deals, to be applied to a particular purpose, so that the buyer necessarily trusts to the judgment or skill of the manufacturer or dealer, there is in that case an implied term of warranty that it shall be reasonably fit for the purpose to which it is to be applied."

Appling these rules to this case, we say that when Farren in Baltimore orders "oysters" of Dameron & Bailey, dealers in oysters, located at Kinsale, and they accept the order, there arises an implied warranty that merchantable oysters are to be delivered, and this contract is not fulfilled by the delivery of anything else but a merchantable oyster.

The appellees' counsel will argue, however, as he insisted below, and as the Court held, that Farren did have an opportunity to inspect and did actually inspect these oysters upon their arrival in Baltimore, and that therefore the case comes within the rule of *caveat emptor*. This we submit is a confusion of ideas.

There is the widest difference possible between an oppor-
tunity to inspect goods after their purchase, at the time of de-
livery, to determine whether they comply sufficiently well with
the contract to justify acceptance, and on the other hand an-
opportunity to inspect them before their purchase for the pur-
pose of deciding whether to make the purchase or not. In
the latter case where the vendee inspects before purchasing,
the theory of law is that he has an opportunity of making
such examination and tests of the article as he may see fit, and
if he omits such examination and tests, he does so at his own
risk, and buys at his peril.

Where, however, a purchaser orders goods, as a cargo of
oysters to be supplied by a dealer, the situation is quite differ-
ent. Farren did not buy a specific existing cargo of oysters,
but sent an order for oysters from Baltimore to Kinsale, Va.
This cargo had no specific existence as a cargo at the time
the order was given. It was a cargo to be selected and as-
sembled by the appellees.

In the one case *caveat emptor* applies because the act of
selection is the act of the vendee. In the other case it cannot
apply because the act of selection is the act of the vendor.

Now, as to the inspection after the contract of sale is
closed, the selection made by the vendors, and the moment of
delivery arrives—this inspection is not for the purpose of de-
termining whether to make a contract of purchase or not, but
to ascertain whether the goods tendered comply with the con-
tract of sale. In this and similar cases it is to ascertain
whether the goods comply with the implied warranty of mer-
chantability. It must be recollected that where goods are ten-
dered for delivery, which have been sold subject to a warranty,
express or implied, and which are not up to the standard war-
ranted, the vendee has two alternatives. He may refuse to
receive the goods or he may accept and sue for the damage
caused him by the breach of warranty. *Warren* v. *Keystone
Co.*, 65 Md. 549.

It is for the purpose of determining whether the goods com-
ply with the contract, and if not, which of these alternatives

he will elect that an examination is made at the time of de-delivery. If he elects to accept, this is not an admission that the goods comply with the warranty. It is well settled that acceptance is no waiver of a breach of warranty. *Crook* v. *B. & O. R. R.*, 80 Md. 347; *Central Trust Co.* v. *Arctic Ice Co.*, 77 Md. 238.

In the latter case, the Court in discussing the question as to how far the final acceptance of certain machines affected the warranty, said: "The acceptance of the machines was no waiver of this warranty and does not deprive the purchaser of the right to sue on the warranty or to rely by way of defense upon a counter claim or recoupment in the vendor's action for the price, if the machines were defective in material or workmanship. * * * And it has been held that this is so whether the defect be latent, patent or discoverable. * * * The acceptance does no more than preclude the purchaser from rescinding the contract and returning the property."

Applying this rule to the present case, Farren by accepting the oysters merely lost his right of rescission. His right to claim damages for the breach of the implied warranty is still open to him.

That there is an implied warranty of merchantability in cases of this kind where goods are ordered from a dealer is established by a long line of authorities. *Benjamin on Sales*, 7 ed. sec. 645; *Beer* v. *Walker*, 46 L. J. C. P. 677; *Murchie* v. *Cornell*, 155 Mass. 63; *Hanson* v. *U. S. Brewing Co.*, 70 Ill. App. 265; *Gardiner* v. *Gray*, 11 Campbell, 145; *Ketchum* v. *Wells*, 19 Wis. 31-2; *Merriam* v. *Field*, 39 Wis. 583; *Warner* v. *Arctic Ice Co.*, 74 Me. 475.

The case of *Beer* v. *Walker*, is almost identical with this case in every particular. Beer, a wholesale provision dealer in London, contracted to send weekly from London by railway to Walker, a retail tradesman at Brighton, a quantity of Ostend rabbits. Under this arrangement Beer delivered certain rabbits to the railroad for delivery to Walker. These rabbits were in good condition when delivered to the railroad.

They were carried to Brighton, where they arrived promptly
the next morning and were accepted by the vendee.   Shortly
afterwards the rabbits in one of the casks composing the ship-
ment were found to be in an unmerchantable condition.   The
Court, in passing on these facts, said:  "The question is was
there an implied warranty that they should be fit for food ?  It
cannot, I think, be contended that when a person undertakes
to supply another with goods which are not specific goods,
there is not an implied warranty that the goods shall be fit for
the purpose for which they ordinarily would be intended to be
used, and that with regard to animals used for human food
that they are fit to be so used.   *   *   *   Then the second,
and in fact the only question really arguable in this case is,
whether such a warranty was satisfied by the delivery to the
railway company in London, or whether the warranty was not
such that if nothing happened out of the ordinary course, the
rabbits should reach the person for whom they were destined
in good order and fit for human food.   Now I am of opinion
that the implied warranty extended to the time at which in
the ordinary course of transit the rabbits should reach the de-
fendant, and not only to that time, but that it continued until
the defendant should have a reasonable opportunity of deal-
ing with them in the ordinary course of business."

If this case is good law, we submit that it disposes of every
question in this appeal.   The case is cited by Benjamin as a
leading one, and so far as we know has never been criticised.
*Murchie* v. *Cornell,* 155 Mass. 63, involved the sale of a cargo
of ice, which at the time of sale was some distance away from
the place where the contracting parties met.   There was no
express warranty.   The contract simply called for a cargo
of "ice."   The Court says: "If a vague generic word is used
like 'ice,' which taken literally may be satisfied by a worthless
article, and the contract is a commercial contract, the Court
properly may instruct the jury that the word means more than
its bare definition in the dictionary and calls for a merchant-
able article of that name.   If that is not furnished the con-
tract is not performed."

*Hanson* v. *U. S. Brewing Co*., 70 Ill., App. 265, is a case of the same kind. A made a contract with B by which he was to purchase 2,000 barrels of "beer" from B, deliveries to be made from time to time as requested. The Court said: "It cannot be denied that the contract between the parties contemplated the delivery by the appellee of beer that was of a merchantable quality for the business of the appellants."

*Gardner* v. *Gray*, 11 Campb. 145; is another leading case, decided by LORD ELLENBOROUGH. The contract here was for the sale of an article described merely as "waste silk" without any reference to quality. The opinion holds "that under such circumstances the purchaser has a right to expect a saleable article. * * * Without any particular warranty this is an implied term in every such contract. * * * The intention of both parties must be taken to be that it shall be saleable in the market under the denomination mentioned in the contract between them. *The purchaser cannot be supposed to buy goods to lay them on a dunghill.*"

*Ketchum* v. *Wells*, 19 Wis. 31-2, involved a contract for the sale of "stave bolts." Held that they must be of good merchantable quality.

*Merriam* v. *Field*, 39 Wis. 583, applies the same rule to a sale of "lumber."

*Warner* v. *Arctic Ice Co.*, 74 Me. 475, is another case of the sale of "ice" where the whole matter is fully reasoned out and the same conclusion reached.

Many of the cases cited by the appellees below relate to sales of beef or other animals intended for food. The rule deduced from these cases, is that, if a retail butcher goes to the warehouse of a wholesaler and selects beef which is in the warehouse and which he inspects, or has an opportunity to inspect, then the rule *caveat emptor* applies, and he must pay for the beef, notwithstanding any latent defects therein. If, on the contrary, instead of visiting the warehouse in person, he sends an order for a certain quantity of beef, the law construes this to mean merchantable beef, and the vendor impliedly warrants that the beef tendered for delivery in fulfillment of this contract

is merchantable beef, free from any defect, latent or otherwise, which will develop in time to interfere with its merchantability. When the beef under such an order is tendered for delivery, the vendee may inspect, but this inspection is not for the purpose of determining whether he will buy or not, for that has already been done, but merely for the purpose of ascertaining whether he will accept or reject the beef tendered, as a compliance with the contract.

If such inspections discloses that the beef is not up to the implied warranty of merchantability the vendee has the option to either reject because of the breach of warranty, or to accept and claim damages against the vendor for the breach of warranty.

Now, applying this rule to a cargo of oysters. If the appellees or their agents, without previous order, had come to Baltimore with a specific cargo of oysters and had offered to sell them to Farren, then he, having an opportunity to inspect *before making the purchase*, would buy at his own risk, and he could not subsequently complain even of latent defects ; but when, on the other hand, Farren in Baltimore sends an order for oysters to the appellees at Kinsale, that is to say, for a cargo to be assembled by them, and they accept by assembling the cargo and forwarding it, then it comes with an implied warranty of merchantability.

*Richard C. Mayo,* for the appellees.

The only question raised by the prayers is whether there is an implied warranty in the sale of chattels that they shall be free from latent defects after they are accepted and inspected by the buyer when the goods are forwarded pursuant to an order from the buyer to the seller, or whether such receipt and acceptance by the buyer closes the transaction.

It is conceded here that the plaintiffs, in good faith, shipped to the defendant the shipments of oysters of the 11th, 13th, 15th and 18th of November, 1901, and that the defendant inspected all of said shipments of oysters, transferred them from the plaintiffs' kegs to their own kegs, re-iced them and re-shipped them.

It is further proved that on the day of the receipt of the shipment of the oysters of November 11th the defendant wrote the plaintiffs a letter, in which they say the goods were in good condition, and in said letter inclosed the plaintiffs a check in full settlement for the same.

The shipment of November 13th was also received by the defendants in good condition and accepted by them, although payment was withheld until November 19th, when a check for the full amount ($247.29) was mailed the plaintiffs. The shipments of November 15th and 18th have never been paid for in full, although there is no question as to their quality and condition.

The shipment of November 11th is the true bone of contention in this case. The defendant's witness, Robinson, says *all* the shipments by his firm to his various customers came out of the plaintiffs' shipment of November 11th, and his witness, Shaw, said he was positive that the shipments to the Forrest City Oyster Company and to Samuel Hagans, came out of the plaintiffs' shipment of November 11th. The sales book of the defendant shows a shipment of 60 gallons of standard oysters to Samuel Hagans on November 14th, but there is nothing to show that this shipment came from the plaintiffs.

There is no evidence, therefore, to show that any of the plaintiffs' oysters received on the 14th of November were unsound, and the fact that they were paid for on the 19th of November (five days after their receipt), would show the defendant sustained no loss on account of re-shipping them.

There being no warranty as to quality in the shipment of November 11th, the plaintiffs are not responsible for latent defects in the goods delivered after the defendant had inspected and accepted them. *Taymon* v. *Mitchell et al.*, 1 Md. Chancery, 497; *Johnston* v. *Cope et al.*, 3 H. & J. 90; *Rice* v. *Forsyth*, 41 Md. 389.

The buyers in this case having exercised their right of inspection and having accepted the goods and paid for them after having inspected them, there is therefore, no implied

warranty that they were fit for the purpose for which they were bought. *Horner* v. *Parkhurst*, 71 Md. 116; *Rasin* v. *Conley*, 58 Md. 65.

There is no implied warranty in the sale of chattels as to quality, and when they are accepted by the buyer the rule *caveat emptor* applies. This rule has always received the sanction of the Courts of this State. *Warren Glass Co.* v. *Keystone Co.*, 65 Md. 547; *Hyatt v. Boyle*, 5 G. & J. 120; *Gunther* v. *Atwell*, 19 Md. 171; *Rice* v. *Forsyth*, 41 Md. 404; *Osgood v. Lewis*, 2 H. & G. 363; see also *Barnard* v. *Kellogg*, 10 Wallace (U. S.) 383.

It cannot be said that the plaintiffs were in a better position to know of the latent defects in these oysters than the defendant. The defendant's manager, Robinson, testifies he has had many years' experience in the oyster business. These oysters were in good condition and properly iced when the plaintiff shipped them, and there was nothing to lead them to believe that they were not in every sense sound oysters. They were also in good condition when received and examined by the defendant and removed to his casks and re-iced by him and re-shipped to his customers. He and his witness, Shaw, both say the oysters were good when shipped from his place, and the letter of November 14th to the plaintiffs reiterates what was said in the letter of November 12th as to their quality. The knowledge of both the plaintiff and the defendant being the same as to the quality of the article, there could, therefore, be no implied warranty as to the fitness or quality of the thing sold. 15 vol. *Am. & Eng. Ency. Law*, p. 1237, (2 ed.)

If the defendant had gone to the plaintiff's shucking house and purchased oysters there after inspecting them it is conceded that the rule *caveat emptor* would apply, but it is contended that since the oysters were forwarded pursuant to an order from the defendant, that this doctrine does not apply, and that there is an implied warranty against latent defects, even after the defendant has had an opportunity to examine them, and has exercised his right of so doing, and has stamped his approval of the goods by forwarding them to his customers, and by paying the plaintiffs the agreed price for them.

This proposition is untenable. Where goods are forwarded pursuant to an order of this kind, (that is to be paid for upon the receipt of the goods at the buyer's place of business,) there is an implied warranty that they shall be merchantable when received by the buyer, and if the oysters in question had reached Baltimore on the 12th of November in an unmerchantable condition the defendant could not have been made to accept them.

This implied warranty, however, ceases when the buyer unqualifiedly accepts the goods. The reason this implied warranty exists in favor of the buyer is that until he receives the goods he has no opportunity to inspect them. After he has had this opportunity the rule *caveat emptor* applies, and it would be absurd to say that the rule is different because the inspection is made at the buyer's place and not at the seller's. The witness, Robinson, testified that his expert could tell by putting oysters over the skimmer whether or not they would turn red, and that his firm did not put Damerons & Bailey's oysters over the skimmer. He also testified that in his years of experience in the oyster business he has frequently seen red or bloody oysters, and that the redness is not always noticeable as soon as the oysters are shucked. Knowing, therefore, that oysters are liable to turn red after being shucked, and knowing that the defect is not always noticeable to the naked eye, was it not his duty to have put these oysters over his skimmer if by that means he could have found out their true condition?

Having the right to examine an article purchased and not exercising that right, is held to be an unqualified acceptance on the part of the buyer of the thing sold. *Horner* v. *Parkhurst*, 71 Md. 116; *Barnard* v. *Kellogg*, 10 Wall. (U. S.) 383.

The fact that the oysters in question were to be used for food in no way raises the presumption of an implied warranty that they shall be merchantable or wholesome. Some of the earlier English cases held that there was an implied warranty that they should be wholesome, but this doctrine has not been followed in the later English cases, and in America the rule is

the other way. *Emmerton* v. *Mathews*, 7 H. & N. 585, *Bumly* v. *Bollett*, 16 M. & W. 644; *Warren* v. *Buck*, (Vermont), 42 Atl. Rep. 979; *Howard* v. *Emerson*, 110 Mass. 320; *Giroux* v. *Stedman*, 145 Mass. 439; *Emerson* v. *Brigham*, 10 Mass. 197; *Windsor* v. *Lombord et al.*, 18 Pick. (Mass.) 57; *Moses* v. *Mead*, 1 Denio (N. Y.) 378; *Benj. on Sales*, (American note), p. 691–692.

Some few cases hold that where the article is sold for domestic use there is an implied warranty that it is wholesome, but it is well settled that this doctrine does not apply to transactions between dealers.

The oysters in question in this case were unquestionably merchantable on the day of their arrival in Baltimore; they remained so, up to and including the time they were re-shipped in the usual course of business, and there was nothing to show what caused them to become unmerchantable after they left Farren's hands. They were shipped to distant points, and the witness Shaw testified they shipped indifferent oysters to nearby points, and Dameron & Bailey's oysters were good oysters, so he shipped them to distant points.

There is nothing in this case to show why these oysters became red. If it was due to weather conditions, or to having been improperly iced by Farren, then the plaintiffs are in no way to blame. No one seems to know what causes this trouble. The witness Robinson testified that a few red oysters mixed with good oysters will cause the whole lot to become red. And he further testified that Farren was shucking oysters at the same time the plaintiffs shipped them the oysters in question.

BOYD, J, delivered the opinion of the Court.

The appellees were shuckers of and dealers in oysters at Kinsale, Va., and the appellant (Burdette H. Farren, trading as J. S. Farren and Company), was a packer of oysters in Baltimore City. During the season of 1900 the appellees sold shucked oysters to the appellant and at the beginning of the season of 1901 they agreed to ship him oysters, for the

season, of sizes known as "standards" and "selects." The price agreed upon was for so much per gallon for "standards" and "selects," respectively, in Baltimore. They were shipped in kegs furnished by the appellees and the appellant emptied them into his own pails or vessels, and returned the empty kegs. They were shipped by steamboats which left Kinsale at noon on Monday, Wednesday and Friday of each week, arriving in Baltimore early the next morning. They commenced shipping in October, and continued to ship by each trip until sometime in November, sometimes shipping more than ordered and at others less. All of the shipments were paid for excepting those of November 15th and 18th, which were accepted by the appellant, but he refused to pay for them because he claimed that those shipped on the 11th and 13th of that month, and received by him on the 12th and 14th, afterwards proved not to be merchantable, and the parties to whom he sold them refused to pay for them because they were what are called "red," or "bloody" oysters. The appellees sued for those shipped November 15th and 18th, and the appellant claimed that he only owed the difference between the price of those and the deductions made by customers on account of "red" or "bloody" oysters received by him on the 12th and 14th of that month, for which he had paid the appellees, and claimed a deduction in the third count of his amended plea of set-off. A demurrer to that count was overruled, but as the questions involved are raised by the prayers, and the demurrer was decided in favor of the appellant, it will not be necessary to make further reference to it. The case was tried before the Court and resulted in a verdict for the plaintiffs. The defendant excepted to the rulings of the Court on the prayers and appealed from the judgment rendered on the verdict.

One of the appellees was a witness and testified that he never heard of oysters turning red until his attention was called to it by the appellant, after the shipment of November 13th, and he did not know what caused it; that he did not know where his firm bought all the oysters shipped to the

appellant, as they purchased them in the shells from dredge boats that came to their place. The agent of the appellant, who made the contract with the appellees, testified that the oysters were duly received at the appellant's place of business in Baltimore; at the time of the receipt they had been shucked were packed in barrels, properly iced and under his directions were taken out of the barrels, re-packed in appellant's pails, properly iced and shipped to the Forest City Oyster Company at Cleveland, Ohio; W. J. Gill of Toronto, Canada; Samuel Hagans of Columbus, Ohio, and A. L. Barr of Davenport, Iowa; that he saw some of them in the barrels and as they were being transferred to the appellant's pails, and they were apparently in good condition and good merchantable oysters without any noticeable defects, that the defendant had been engaged in the oyster business for many years and was competent to pass on this question; that he, the witness, in his years of experience in the oyster business had frequently seen what was known to the trade as "red" or "bloody" oysters; that the cause of such redness is not well understood but it gives them a red color and gives the liquor the color of blood. "That 'red or bloody' oysters are unmerchantable oysters; that the redness is not always noticeable as soon as the oysters are shucked, and that in many cases it does not develop for some days after the same are shucked, and that a comparatively small number of the 'red' or 'bloody' oysters packed with other oysters in a pail or other vessel will, in time, discolor the other oysters in said pail, so as to render the whole contents thereof absolutely unmerchantable." He also said that if the redness in a cargo is discovered in time, it is possible to save some of them by having them steamed, which process develops the redness so that the good oysters can be selected from the red.

The appellant also offered evidence tending to show that all the oysters shipped to the four parties above named, at that time, were received from the appellees, and an agreed statement of facts as to what they would testify to was read, in which it was shown that most of the oysters received by them

from the appellant at the times mentioned were unmerchant-
able, being "red" or "bloody."

It is contended on the part of the appellant that under
the circumstances of the dealings between him and the appel-
lees, there was an implied warranty that the oysters were
merchantable and were free from latent defects.    We do not
understand it to be denied by the appellees that, if the oysters
were not merchantable when received by the appellant, he
was not under obligation to accept them, but they deny that
they are responsible for latent defects, such as complained of,
which developed after they were received, inspected and ac-
cepted by the appellant in Baltimore.    It is not claimed that
there was any fraud on the part of the appellees, and there is
nothing to show that they knew of the defect when they
shipped them, and, as we have seen, the member of the firm
who testified said he had never heard of this trouble with
oysters until his attention was called to it by the appellant.
Under the contract the oysters were to be delivered in Balti-
more and were actually so delivered.    The appellant not only
had the opportunity to do so, but in fact did inspect them, and
he wrote to the appellees on November 12th acknowledging
receipt of those shipped on the eleventh, stating "stock and
measure all right," and enclosing check to cover indebtedness
to date.    On the 14th he acknowledged receipt of shipment
of the 13th and said the stock to all appearances seemed to
be all right, but he had just received a telegram from a cus-
tomer that part of the oysters which he had received the day
before were red.    Two of his employees testified that they
were apparantly in good condition when they examined them
in Baltimore.

The important question therefore to be determined is,
whether the implied warranty that the oysters were merchant-
able is to be so extended as to warrant their quality, so as to
protect the appellant to the time they were delivered by him
to the purchasers from him, against a defect such as this com-
plained of.    The general principles applicable to implied war-
ranties have been so frequently announced by this Court that

it seems almost useless to repeat them, but it may be well
to recall some of them.    As was said in *Horner* v. *Parkhurst*,
71 Md. 116, "Where the buyer has an opportunity of exam-
ining the thing sold, there is no implied warranty, in the ab-
sence of fraud or *express warranty,* that it shall be fit for the
purpose for which it was bought.    In such cases the rule *caveat
emptor* applies, by which is meant that unless the buyer sees
fit to require a warranty, he takes upon himself the risk as to
quality," citing *Osgood* v. *Lewis,* 2 H. & G. 518; *Hyatt* v.
*Boyle,* 5 G. & J. 110; and *Rice* v. *Forsyth,* 41 Md. 389.    The
appellant however seeks to distinguish this case from those
and others announcing a similar doctrine, on the theory that
it only applies when the purchaser has had an opportunity to
inspect specific existing chattels, and that it has no application
to a case in which one orders goods *to be* supplied and deliv-
ered to him by a dealer in such articles.    But conceding, as
we do, that such distinction is recognized by the authorities,
is the doctrine of implied warranty to be carried so far as to
make the vendor liable for a defect such as this, which was not
discovered until after the oysters were delivered, inspected, ac-
cepted and shipped to distant places?    If, as the Court below
determined by granting the defendant's second prayer, it being
a contract for future deliveries, there was an implied warranty
that the oysters should be merchantable, it certainly had some
limit.    There was a better opportunity to ascertain whether
they were merchantable when they were received in Baltimore
than there would have been if the appellant had gone to the
appellee's place of business and selected them there.    The
appellant could not be required to accept them until they were
delivered in Baltimore and he had the opportunity to inspect
them, and when he not only had the opportunity, but actually
did inspect them, in a way that was certainly as thorough, if not
more so, than he could possibly have done at the appellees' place
before purchase, and then accepted them as merchantable, which
they apparently were, as both the appellant and the appellees had
reason to believe, it is hard to see the necessity for or justice in a
rule of law that would make the appellees liable for defects that

subsequently develop when it is conceded they would not have been if the appellant had inspected them before he purchased them. The theory of implied warranty of quality is that the purchaser has relied on the judgment of the seller, and has had no opportunity to see for himself, and ordinarily unless that is so there is no implied warranty, for when there is ample opportunity for the purchaser to inspect, and he does so, there is no reason for the law implying a warranty. In *Horner* v. *Parkhurst*, *supra*, there was a controversey as to whether there was an express warranty of some benzine, and after referring to that, the Court said that the doctrine of implied warranty had no application to the facts in the case. After saying what we have quoted above the Court added, "So in this case if the defendant *had an opportunity of inspecting and testing the benzine before he used it*, then, in the absence of fraud or express warranty, it was no defense to the action that it turned out to be inferior in quality to what he supposed it to be or what he wanted." There the time fixed by the Court was not before the purchase but *"before he used it,"* if he had the opportunity of inspecting and testing the benzine.

The general rule is that when a manufacturer sells articles for a purpose known to him, there is a warranty against latent defects growing out of the process of manufacture. That is because he is presumed to know the defect caused by the way in which it is made, and so if he knowingly uses improper materials in the manufacture of the article sold, but even then the authorities differ as to whether he is liable for latent defects in materials used which he could not have discovered by reasonable diligence, and it has been held in some cases that he does not impliedly warrant against latent defects unknown to him, resulting from the unskillfulness in the work of some other manufacturer, or from the use of defective materials furnished by others. 15 *Am. & Eng. Ency. of Law*, (2 ed.) 1233. In the recent case of *Queen City Glass Co.* v. *Pittsburg Clay Pot Co.*, 97 Md. 429, we held that where the manufacturer of clay pots, *made by a secret process*, sold some of them with knowledge of what they were to be used for,

there was an implied warranty under the principle approved in
*Rice* v. *Forsyth*, 41 Md. 403, that "Where a manufacturer
contracts to supply an article which he manufactures to be
applied to a particular purpose, so that the buyer necessarily
trusts to the judgment or skill of the manufacturer, there is in
that case an implied term or warranty that it shall be reason-
ably fit for the purpose to which it is to be applied. *In such
a case the buyer trusts to the manufacturer or dealer, and relies
on his judgment and not upon his own."* As a reason for
holding the manufacturer liable we said in the Clay Pot case
that "It was impossible for the purchaser to know, by an in-
spection or otherwise, whether the various component ele-
ments had all been used, or, if used, whether they had been
used in proper proportions," etc. In 15 *Am. & Eng. Ency.
of Law*, 1235, the substance of what is quoted above from
*Rice* v. *Forsyth*, is said to be sustained by the weight of au-
thority, where *a dealer* contracts to supply an article in which
he deals to be applied to a particular purpose, but the
author adds, "*This rule, of course, does not extend to cases
where the purchaser and the seller have equal means of knowl-
edge* as to the fitness of the thing sold for the purpose for which
it is sold," and on p. 1237 it is said "The liability of a grower
or producer of an article or commodity sold for a particular
purpose is identical with that of the manufacturer of an article
or commodity so sold. This rule obviously has its limits. It
does not impute to the seller knowledge as to the qualities or
fitness which no human foresight or skill can attain, and raise
an implied warranty in respect to them, *when the vendor and
the purchaser are in equal condition as to the means of knowl-
edge, or the latter must understand from the nature of the case
that the information, experience and knowledge of the vendor are
not superior to his own."* This qualification is very applicable
to the case now before us. As we have seen, the member of
the firm who testified for the appellees said he had never
heard of red or bloody oysters before, while the appellant's
agent was familiar with them. The appellant could not
therefore have relied on the appellees' judgment as to whether

these oysters were free from this defect. If the appellant, or his agent, could not detect the defect when they arrived in Baltimore, surely the appellees could not have done so, before they shipped them from Virginia. If it be true that they never heard of such defect, it is certain they never intended to warrant against it, and if it was known to the appellant, and he wanted to guard against it, he ought to have demanded an express warranty.

In addition to what we have said, we think it would be an exceedingly dangerous extension of the doctrine of implied warranties to apply it to such articles as oysters under the facts of this case. The evidence offered by the appellant is that a few oysters having this defect may impregnate or affect all in the pail or vessel in which they are shipped. There is some testimony tending to show that the appellant did include some oysters to his customers which were not purchased from the appellees. If that was the case, it may be that those sold by the appellees were not so infected until brought in contact with others that were. What causes the trouble is not explained, and indeed what the redness is is not well understood. It is not even shown that an oyster in which it afterwards develops may not have been entirely free from it when shucked. The inference can be drawn from the evidence that it may be, as it was said that a few red oyters in a pail will in time affect all the others in that pail. Possibly the pails of the appellant were infected by the oysters of other dealers and produced the trouble. If it be a defect that may not develop until some days after they are shucked, and it is necessary to guard against loss on account of it, the purchasers can protect themselves against it by requiring express warranties, but we are not willing to so extend the doctrine of implied warranty as to make a vendor liable for such perishable articles as oysters for such length of time and under such conditions as this record discloses. The only case cited to sustain the appellant's theory that much resembles this, is that of *Beer* v. *Walker*, 46 L. J. C. P. 677. There some rabbits that were shipped from Beer, in London, to Walker, in Brighton, were

accepted by Walker and shortly afterwards those in one of the casks were found by him to be in an unmerchantable condition.   An expression used by the Court in that case, if approved, would not only make the seller liable for such deterioration of quality as would result necessarily from the transit to the purchaser, but even after that time while he was shipping them to his customers.   For reasons we have given, we cannot follow that decision, if it can be construed to apply to such facts as we have shown to be in this record, which we do not think it does.   Without deeming it necessary to discuss the several prayers, we will affirm the judgment of the lower Court.

*Judgment affirmed, the appellant to pay the costs.*

(Decided June 9th, 1904.)