# LURIA BROTHERS & COMPANY, INC.

## *vs.*

## HARRY KLAFF.

*Sale—Implied Warranty—Fitness for Purchaser's Purpose— Ambiguous Contract—Evidence.*

Under the Uniform Sales Act, Code, art. 83, sec. 36 (1), providing that "where the buyer expressly or by implication makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill and judgment (whether he be a grower or manufacturer or not), there is an implied warranty that the goods shall be fit for such purposes," the seller who is not the grower or manufacturer of the thing sold is in the position which was formerly held by the manufacturer or grower only, in reference to the implied warranty mentioned.          pp. 592-595

A contract for the sale of "steel shells, 3 inch, 6 inch, and 9 inch," is sufficiently ambiguous as to its subject-matter to justify the admission of oral evidence to explain it.     pp. 595, 596

On an issue as to an implied warranty, on a sale of steel shells by plaintiff to defendant, as regards their fitness for remelting purposes, *held* that it was proper to ask plaintiff on cross-examination whether the shells were sold by him at scrap-steel prices.                              pp. 590, 596

On an issue as to an implied warranty of fitness for remelting purposes of steel shells sold by plaintiff to defendant, evidence as to plaintiff's knowledge that they were bought for remelting purposes was admissible.              pp. 590, 596

On such issue it was error to exclude testimony by an officer of a company, to which the defendant resold the shells, as to the results of his examination and testing of the shells with reference to their fitness for remelting purposes, and as to the reason for his delay in attempting to use them.        pp. 591, 596

It was also error not to allow defendant to prove by the witness that the shells were "dangerous and unmerchantable as material bought and sold by dealers in scrap iron and steel."
pp. 591, 596

On an issue as to an implied warranty, on a sale of steel shells, of their fitness for remelting purposes, a question asked an officer of a company to which the shells were resold by the purchaser, whether his examination of the shells disclosed any defect which would render them unsuitable for his purposes, was properly excluded, since they might be unsuitable for his purposes for reasons other than those as to which the purchaser had a right to complain.　　　　　　　　　　p. 596

On an issue as to an implied warranty of the fitness for defendant's purposes of material sold him by plaintiff, that only part of the material was returned, and that there was no evidence of any difference between that used by defendant and that returned, was immaterial, the contract being divisible, as a sale for so much per ton, and it not appearing that the price per ton depended on the quantity ordered, or that plaintiff was in any way injured by defendant's failure to return all the material.　　　　　　　　　　　　p. 597

A sale of five carloads of metal at a named price per ton *held* to be a divisible contract.　　　　　　　p. 597

*Decided December 2nd, 1921.*

Appeal from the Baltimore City Court (SOPER, C. J.).

Action by Harry Klaff, trading as H. Klaff & Company, against Luria Brothers & Company, Incorporated. From a judgment for plaintiff, defendant appeals. Reversed.

The cause was submitted on briefs to BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*Venable, Baetjer & Howard* and *William L. All,* for the appellant.

*Meyer Rosenbush,* for the appellee.

ADKINS, J., delivered the opinion of the Court.

This suit was brought by appellee to recover from appellant a balance of $3,790.30 for several carloads of metal, sold and shipped between March 15th and June 5th, 1920. The amount of this balance was admitted by appellant, the dispute being only as to the validity and amount of appellant's claim of set off arising out of a previous sale of five carloads of steel shells by appellee to appellant, shipped from the naval proving ground at Aberdeen, Maryland, to appellant at its yard in Reading, Pennsylvania, and reconsigned by appellant to the Carpenter Steel Company, also located at Reading. Three of the five carloads were rejected by the Carpenter Steel Company, and appellant tendered a return to appellee. On the refusal of appellee to accept the return of the three rejected carloads and furnish appellant with shipping instructions, they were re-shipped by appellant to appellee at the naval proving ground. The claim of set off was for the purchase price paid by appellant for the rejected cars, together with railroad demurrage charge which accrued pending shipping instructions from appellee.

There are seven bills of exception in the record, all based on the rulings of the trial court on evidence. It appears from the testimony that the shells were purchased over the telephone, three or four days after the president of the appellant company had called at appellee's office in Baltimore and been shown a few sample shells which he had in his yard. After the telephone conversation appellant sent appellee a written order for the shells, which was accepted. The order was as follows:

"Lebanon, Pa., January 15, 1920.

"No. 3576 L.

"Luria Brothers & Company, Lebanon, Pa., agrees to buy and Messrs. H. Klapp & Co., Central Ave. and Gough Street, Baltimore, Md., agrees to sell:

"Material: Steel shells, 3 inch, 6 inch, and 9 inch.

"Quantity: Approximately two hundred (200) tons.

"Price: $25.00 per gross ton f. o. b. cars Aberdeen Proving Grounds, Md.

"Delivery: Prompt.

"Terms: Usual.

"Remarks: Shipping instructions will follow within a few days.

                    "Luria Bros. & Company,
                              "Main Office.

"Received Jan. 22, 1920.

"(Note.—Material must be waybilled as scrap iron and be loaded in not less than minimum carload lots. Unless otherwise instructed, material must be loaded in gondola cars.

"Accepted: H. Klaff & Co.

"Dated: P. P. W. M. Schreiber 1/21/20.

                    "Luria Brothers & Company.
                              "By Max Silberman."

On January 29, 1920, appellant wrote appellee:

"Confirming 'phone conversation with our Mr. Silberman, kindly proceed with the loading of the shells; they are intended for Jersey City. We will give you correct shipping instructions in a few days."

And on February 21, 1920:

"Please ship your shells to the Crucible Steel Company, Atha Works, Harrison, N. J., for our account."

And on February 24, 1920:

"Our Mr. Silberman advises us today that you have not received our letter of Feb. 17th, changing shipping instructions on the 200 tons of steel shells covered by our order No. 3576.

"We advised you on the above date to ship to Luria Brothers & Company, Reading, Penna., P. & R. or Penna. R. R. delivery, P. & R. preferred, providing the freight rate is the same as via Penna. R. R."

H. Klaff (trading as H. Klaff & Co.), the appellee, was asked on cross-examination: "Q. I am talking about at the time the contract was made. Was any reference made by either you or Mr. Silberman as to the samples Mr. Silberman had seen in your office? A. I cannot remember. Q. You are familiar with the business carried on by Luria Brothers & Company, are you not? A. I am familiar as far as iron and steel goes; yes, sir; I am not familiar with their business at all; I am only familiar with what business they have done with us. Q. You also knew that they resell scrap iron and scrap steel to mills for reheating purposes, do you not? A. I do; yes, sir. Q. Were the shells mentioned in the contract sold to Luria Brothers & Co. at scrap-steel prices?"

Objection to this question was sustained, and the refusal of the court to permit this question to be answered was the ground of the first exception.

The second exception was to the refusal of the court to permit appellee to answer the following question: "Q. Did you know the purpose for which the defendant purchased the shells mentioned in the contract?"

Appellee further testified that appellant paid seventy-five per cent. of the bill for these shells upon receipt of invoices before they reached Reading.

Appellant then put Max Silberman, its vice-president, on the stand, and offered to prove by him: "that the material mentioned in the above contract was purchased as, and understood between the parties to be, scrap metal in the form of exploded shells to be used for remelting purposes."

Objection to this offer was sustained and this constitutes the third exception.

Appellant then proved by Abe Luria that he had been for three years general manager of appellant company, that one of his duties was to identify shipments which are purchased and consigned to his company, and report to his company; that their traffic manager then ordered the material shipped to his company's purchasers; that he made only a casual examination of the shells in controversy; that he consigned

the shipment to the Carpenter Steel Company, of Reading, Pa.; that three of the five cars were rejected by said company, and were returned to appellee at Aberdeen, Maryland.

Charles C. Wilson, superintendent of the melting furnaces of the Carpenter Steel Company, was asked: "Q. Did you make an examination of the shells at the time they were received? A. Yes. Q. Did your examination disclose any defect which would render the shells unsuitable for your purposes?"

Objection to this question was sustained, and this was the basis for the fourth exception.

The court further refused to permit this witness to answer the following questions: What happened when you attempted to use the shells in your furnaces? Why did you not attempt to use them immediately? (The witness having testified that the shells had been in the company's yards about three or four weeks before he attempted to remelt them.)

These rulings of the court were the grounds for the fifth and sixth exceptions.

Appellant then made a formal offer to prove by the said witness, "that the material mentioned in the above contract was dangerous and unmerchantable as material bought and sold by dealers in scrap iron and steel."

Refusal of the court to permit said testimony was the ground for the seventh exception.

It will be seen that the purpose of appellant was to establish the following facts: First, that the shells were understood between the parties to be unloaded, non-explosive shells and were bought as scrap steel; second, that they were to be used for remelting purposes and that appellee knew this fact, and that appellant relied on appellee's skill and judgment; third, that the shells were, in fact, explosive and unfit for remelting, and were dangerous and unmerchantable as material bought and sold by dealers in scrap iron and steel; fourth, that the defects were latent and only discoverable by heating test; fifth, when the explosive nature of the shells was discovered; sixth, why the Carpenter Company allowed

the shells to remain for three or four weeks in its yard before a furnace test was made.

The trial court, in excluding testimony tending to prove these facts acted, apparently, on the theory that the written contract must speak for itself and that there was no implied warranty.

It seems reasonably clear that the view taken by the court in regard to implied warranty was in accordance with the settled law of this State and of nearly all the states of this country as it stood prior to the Uniform Sales Act of 1910, codified as article 83.

In *Commercial Realty Etc. Co.* v. *Dorsey*, 114 Md. 178, decided after the passage of the Uniform Sales Act, but in reference to a contract made prior thereto, the law of implied warranties was stated to be as follows: "Where a manufacturer contracts to supply an article which he manufactures to be applied to a particular purpose so that the buyer necessarily trusts to the judgment or skill of the manufacturer, there is in that case an implied term or warranty, that it shall be reasonably fit for the purpose to which it is to be applied. In such a case the buyer trusts to the manufacturer or dealer and relies upon his judgment and not upon his own." Citing *Queen City Glass Co.* v. *Clay Pot Co.*, 97 Md. 429; *Rice* v. *Forsyth*, 41 Md. 403, and *Jones* v. *Just*, L. R. 3 Q. B. 197.

"We have held with equal clearness that when the seller is not the manufacturer of the article sold and the buyer has an opportunity of examining it, there is no implied warranty, in the absence of fraud, that it shall be fit for the purpose for which it was bought. In such cases, if there be no express warranty, the doctrine of *caveat emptor* applies and the buyer not having seen fit to exact a warranty, takes upon himself the risk as to quality." Citing *Horner* v. *Parkhurst*, 71 Md. 116; *Farren* v. *Dameron*, 99 Md. 337; *Rice* v. *Forsyth*, 41 Md. 389, and *Raisin* v. *Conley*, 58 Md. 65.

But the cases cited above all arose prior to the adoption in this State in 1910 of the Uniform Sales Act, article 83 of the Code.

Section 36 (1) provides:

"Where the buyer expressly or by implication makes
known to the seller the particular purpose for which
the goods are required, and it appears that the buyer
relies on the seller's skill and judgment (whether he
be a grower or manufacturer or not), there is an im-
plied warranty that the goods shall be reasonably fit
for such purposes."

It will be seen that the important change made by this sec-
tion was to put the seller, who is not the grower or manu-
facturer of the thing sold, in the position which was formerly
held in this State by the manufacturer or grower only, in
reference to the implied warranty mentioned.

The case of *St. S. Angelo Toso* (C. C.. A., 3rd Circuit),
271 Fed. 245, construes the Pennsylvania Sales Act, section
15, which is the same as section 36 (1) of Maryland, Code,
article 83. That case arose out of an oral contract confirmed
by correspondence, wherein the navigation company pur-
chased from the coal company "1,000 tons bituminous coal
for delivery to our steamers price * * * to be $5.81 per ton
trimmed in bunkers." When alongside the steamer, and after
its failure to respond satisfactorily to burning tests, the navi-
gation company rejected the coal and refused payment. It re-
mained on lighters until sold to another concern. Libel was in-
stituted to recover the contract price. Respondent pleaded a
warranty as to the quality of the coal and defended on its
breach. The court held that the above section of the sales
act was in effect a qualification of the doctrine of caveat
emptor. It affirmed the lower court in dismissing the libel
on the ground that, although the coal was found to be mer-
chantable, it was not reasonably fit for the purpose for which
it was required, and that the buyer relied on the seller's skill
and judgment in selecting the coal. The buyer had no op-
portunity to see the coal before it was purchased, or to in-
spect it before it was delivered. The court quotes from *Kel-
logg Bridge Co.* v. *Hamilton*, 110 U. S. 108, as follows: "Ac-

cording to the principles of the decided cases, and upon clear
grounds of justice, the fundamental inquiry must always be
whether, under the circumstances of the particular case, the
buyer had the right to rely and necessarily relied on the judg-
ment of the seller and not upon his own."

In the *Hamilton case,* which was before the distinction
between manufacturer and dealer had been abolished, the
court was dealing with a manufacturing seller.   The court
in the *Angelo Torso case, supra,* calls attention to the fact
that, prior to the enactment by most of the states of the Uni-
form Sales Act, a distinction was made by some courts, in-
cluding the Pennsylvania courts, between a seller who was a
producer, that is, a grower or manufacturer, and a seller who
was a dealer.   "But," it continues, "the Pennsylvania sales
act used terms which on their face seem to abolish this dis-
tinction (as by like terms, in the English sale of goods act,
the distinction was abolished), for they define the seller, on
whose skill and judgment the buyer relies, as one whether he
be grower or manufacturer or not."   Citing *Griffin* v. *Metal
Products Co.,* 264 Pa. 254, as settling the question in Penn-
sylvania.

*Griffin* v. *Metals Products Co., supra,* construed a contract
for the sale of high speed steel, and centered on the question
whether there was an implied warranty that the steel should
be reasonably fit for the purpose for which the seller knew it
was to be used.

The court said:   "Before the passage of the act, it had
been repeatedly so held, so far as relates to the grower or
manufacturer of the goods sold, and the only change made
thereby was to extend the rule to every seller, 'whether he be
the grower or manufacturer or not.' "

In *Benjamin, Sales* (6th Eng. Ed.), 716, it is said: "The
distinction taken at common law between cases where the
buyer had an opportunity of examining the goods and those
in which he had none (a distinction which clearly appears
from the language of Rule 1 when contrasted with that of

3 and 4 of Mellor, J.'s, classification in *Jones* v. *Just*) has
been abrogated by the Code. Instead of a presumption that
a buyer, who might have inspected the goods, bought on his
own judgment, in future whether he so bought or not will be
a question of fact, and an opportunity of examination and
even an actual examination will be immaterial. And no dis-
tinction is drawn by the Code between contracts of sale of
specific as distinguished from those of unascertained goods.
At common law the buyer of a specific thing for a particular
purpose took the risk of the fitness of the thing bought."

He quotes from PALLES, C. B., and ANDREWS, J., in *Wallis*
v. *Russell,* 2 Ir. R. 585, C. A., as follows: "In fact, the view
of the legislature appears to have been that, instead of the
law, as theretofore, presuming that the buyer relied upon his
own judgment where there was an opportunity of inspection,
for the future, *whether he relied upon his own judgment or
not* should be *a question of fact.* In cases within sub-section
(2), if he has examined the goods, he is to be held to have
relied upon his own judgment so far, but so far only, as re-
gards defects observable upon examination. But in cases
within sub-section (1), in cases in which the vendor is aware
that his judgment and skill are relied on by the buyer, op-
portunity of examination or the fact of examination is thence-
forth to be immaterial."

To the same effect is *Williston, Sales,* sec. 248.

We do not think the testimony offered by appellant and
excluded by the trial court was open to the objection that it
violated the rule against admitting parol evidence to vary or
add to a written contract. Apart from any modification of
this rule under the Uniform Sales Act in the matter of im-
plied warranties (*Benjamin, Sales,* 716), even before the
adoption of that act it was the law of this State that, as to the
subject matter of a contract,, extrinsic evidence may and must
be received and used to make that clear, if necessary for that
purpose; that the contract must be applied to its subject mat-
ter by evidence from without. Such evidence, however, is

not to be used to contradict or vary the written instrument, but to aid, uphold and enforce it as it stands. *Stockham, Garnishee,* v. *Stockham,* 32 Md. 196; *Roberts* v. *Bonaparte,* 73 Md. 204; *Chesapeake Co.* v. *Goldberg,* 107 Md. 488; *Dronenburg* v. *Harris,* 108 Md. 614; *United Railways Co.* v. *Wehr,* 103 Md. 323; *Amer. Bonding Co.* v. *U. S. Fid. & Guar. Co.,* 131 Md. 203.

There is certainly enough ambiguity about the description of the goods sold as "steel shells, 3 inch, 6 inch, and 9 inch" to permit of oral explanation, under the authority of the cases above cited.

The case of *Hattiesburg Plumbing Co.* v. *Carmichael,* 80 Miss. 66, is a good illustration. There parol evidence was admitted as to the sense in which the word "artesian" was used in a contract to drive a well, there being a primary meaning, viz.: a well where there is a natural flow; and a secondary meaning, viz.: a well where the flow is produced by artificial means. It will be seen, on examination of cases like *Warren Glass Works Co.* v. *Keystone Coal Co.,* 65 Md. 547, where oral testimony was excluded, that the exclusion was on the ground that the terms of the contract were plain and needed no explanation.

Having reviewed at some length the law applicable to the case, the exceptions can be disposed of briefly. The first question to which objection was sustained was a proper question on cross-examination, and the court erred in sustaining the objection.

The court's rulings on the second, third, fifth, sixth and seventh exceptions were both erroneous and prejudicial.

The question asked Charles C. Wilson, superintendent of the melting furnaces of the Carpenter Steel Company, to whom the shells were resold by appellant, viz.: "Did your examination disclose any defect which would render the shells unsuitable for your purposes," was too broad. They might have been unsuitable for his purposes for other reasons than those as to which appellant had a right to complain. The

objection to this question, the ruling on which was the basis of the fourth exception, was properly sustained.

The objection urged by appellee that only part of the shells were returned by appellant, and that there was no evidence of any difference between those used and those returned, is not material to the decision of the questions before us, however important it might be as bearing upon the good faith of appellant.

This is clearly a divisible contract. The price of the goods was not a lump sum for the five carloads, but twenty-five dollars per ton; and there is nothing in the record to show that the price per ton depended upon the quantity ordered, or that appellee was in any way injured by the failure of appellant to return all the shells. Nor is there any evidence from which such injury can be inferred. *McCeney* v. *Duvall,* 21 Md. 166; *Benjamin, Sales* (6th Eng. Ed.), p. 503; *Elliott, Contracts,* sec. 5114.

> *Judgment reversed and new trial awarded,*
> *with costs to appellants.*