## 11396

### WILLIAMS v. STANDARD OIL CO *ET AL.*

#### (121 S. E., 363)

1. EVIDENCE—EXPERT TESTIMONY THAT ILLUMINATING OIL WHICH MET STATUTORY REQUIREMENTS WAS UNSAFE ADMISSIBLE.—In an action against an oil company for injuries caused by the explosion of a kerosene oil lamp, expert testimony that there were substances that made the oil unsafe for use, notwithstanding that it complied with Civ. Code, 1922, § 3486, requiring the flash test of illuminating oils to be not less than one hundred degrees Fahrenheit, was admissible.

2. WITNESSES—EVIDENCE THAT EXPERT HAD PREVIOUSLY MADE ERRONEOUS ANALYSIS ADMISSIBLE.—In an action against an oil company for injuries caused by the explosion of a kerosene oil lamp, evidence that defendant's expert witness had made an analysis of another sample of oil, and that such analysis was erroneous was admissible to impeach the integrity of the analysis relied on.

3. ACTION—PLAINTIFF CANNOT RELY ON BREACH OF WARRANTY IN ACTION SOUNDING IN TORT.—Where the action sounded in tort and not in contract, plaintiff cannot rely on a breach of warranty.

Note: On liability of manufacturer, packer, or vendor to persons not in privity of contract, for injuries from defects in article sold, see notes in 19 L. R. A. (N. S.), 923; 48 L. R. A. (N. S.), 213, and L. R. A. 1916B, 879.

On manufacturer's or packer's liability for injury by explosion to person or property of ultimate consumer, who purchased from middleman, see note in 17 A. L. R., 698.

For discussion of the question of admissibility of expert testimony as to cause of occurrence or accident, see note in L. R. A. 1915A, 1045.

Before MAULDIN, J., Richland, October, 1922.     Reversed and remanded.

Action by Madeline Williams, by her guardian *ad litem,* E. H. Williams, against Standard Oil Company *et al* Judgment for defendants and plaintiff appeals.

*Messrs. Graydon & Graydon, Cole L. Blease, J. C. Busbee,* for appellant, cite: *Liability of the manufacturer of an article inherently dangerous:* 112 Pac., 467; 154 Fed., 121; 148 Pac., 507; 195 N. Y., 478. *Liability if real article is not dangerous but which by reason of negligent construction is dangerous:* 121 N. Y., 157; 174 N. C., 324; 73 S. E., 1087; 97 S. E., 27; 84 S. E., 69. *The seller of a dangerous article is liable to anyone who buys it without notice:* 92 Am. Dec., 768; 104 Mass., 64; 212 U. S., 159; 264 N. W., 668; 110 N. W., 20; 264 Fed., 829. *Statute describing safety test established only a minimum of care:* 106 Pac., 337; 139 Mich., 18; 87 Mass., 324; 1 Thomp. Neg. Sec. 13; 66 S. C., 376. *New remedy will be construed to be in addition to existing remedies:* 67 S. C., 498; 117 S. C., 147. *Statute in derogation of common law must be strictly construed:* 218 U. S., 289; 70 So., 660; 58 So., 182; 160 N. C., 252; 204 U. S., 426. *Statute enacted for safety and protection of the public should be so construed as² to give full benefit to the public:* 63 So., 1012; 127 Md., 572; 64 S. E., 728; 142 N. W., 495; 79 N. J. Law., 316; 136 N. Y. S., 466; 62 Sou., 912; 14 S. C., 247; 82 S. C., 508; 99 S. C., 318; 113 S. W., 1048; 123 Tenn., 502; 121 Ill. Ap., 121; 175 Ind., 35; Endlich on Statutes Sec., 251, 258, 267. *Right to question testimony of expert witness:* 15 Pac., 86; 71 Pac., 3; 3 Encyp. of Ev., 858; 876. *Contradiction of witness:* 67 S. C., 347.

*Messrs. Benet, Shand & McGowan, Efird & Carroll,* and *Timmerman & Graham,* for respondents, cite: *Testimony improperly stricken out still left for consideration of the jury:* 117 S. C., 44. *Court has right to strike out evi-*

*dence improperly admitted:* Abbott Civ. Jury Trials, 4th Ed., 466. *Witness cannot be impeached as to collateral or immaterial matter brought out on cross-examination:* Abbott Civ. Jury Trials, 4th Ed., 295; 2 Bailey 466. *No cross-examination permitted as to evidence stricken out without objection:* 17 So., 284; 20 Kan., 36; 7 Rich., 97. *Attack on standard established by the state properly excluded:* 114 S. C., 136. *Force and effect of State standards:* 97 S. C., 358; 20 S. C., 430; 212 U. S., 159; 97 U. S., 501; 173 N. W., 20; 66 Ga., 160; 110 Mass., 470; 123 N. W., 992; 102 N. W., 229; 106 Pac., 337. *Action was in tort, not in contract:* 115 S. C., 376; 212 U. S., 178. *Implied warranty not involved:* 117 S. C., 140. *Doctrine of res ipsa loquitor does not apply:* 179 U. S., 658; 212 U. S., 176; 119 Fed., 572; 8 A. L. R., 500; 20 R. C. L. Negligence, Sections 156-8; 90 S. C., 512. *Judgment should be affirmed on the whole record:* 78 S. C., 81; 93 S. C., 299.

January 14, 1924.

Petition for rehearing dismissed February 14, 1924.

The opinion of the Court was delivered by MR. JUSTICE FRASER.

The respondents, in their argument on appeal, state in part:

"This is a suit by Madeline Williams, by guardian *ad litem,* E. H. Williams, against Standard Oil Company, for injuries received by her as the result of what the plaintiff claimed to be an explosion of a lamp. Joined with the Standard Oil Company as defendants were A. J. Amick, the agent at Batesburg, and E. M. Givens, the driver of a wagon of defendant which delivered oil.

"The allegations of negligence as charged in the complaint were:

"First, that the defendant sent out a tank loaded with the established law of the land to *punish a man for the com-*

fendant, knowing the danger of mixing gasoline and kerosene, nevertheless, sent out gasoline and kerosene in the same tank and sold them from the same wagon to its various customers.

"Second, that on the 11th of February, 1921, Givens, the agent of the Standard Oil Company, sold some gasoline to Thomas Quattlebaum and went from there directly to the place of business of W. W. Hall and drew out some kerosene in the same container in which he had just drawn the gasoline, thus making a highly explosive and dangerous product instead of selling pure kerosene which the law required them to sell.

"Third, that the mixture which was sold by Hall to S. D. Derrick through his agent was not pure kerosene oil, but that said oil had been allowed to become mixed with gasoline or some other high explosive so that the same was no longer safe to use and when used in the ordinary and accustomed way exploded and burned the plaintiff.

"The proof of the plaintiff's case, briefly stated, was that on 11th of February, 1921, S. D. Derrick sent Ben Williams to the store of W. W. Hall to purchase one gallon of kerosene for use in his home. This kerosene was put in an ordinary type kerosene can and carried by Williams to the home of S. D. Derrick. The oil from this can was used in the lamps at the Derrick home from the 11th of February until the night of the 18th of February. On that night a glass lamp having become empty, Mrs. Derrick took it up and refilled it from the same oil can. After supper Mrs. Derrick was sitting in front of the fireplace mending shoes with the lamp on the floor at her right hand and the child Madeline Williams was playing on the floor. Magdalene Rowland, a young girl, the only other occupant of the room, was standing at the fireplace. The testimony is conflicting as to what fire there was in the fireplace, but there was some fire burning there.

"In an adjoining room in the same house quite a number of persons were gathered, including Mrs. Derrick's husband, S. D. Derrick, and other relatives and friends.

"Magdalene Rowland's account of what happened was that Mrs. Derrick was sitting with her 'feet on the hearth. The lamp was on her right side between her and the fire which at that time was nothing but a lightwood knot flickering up and down. She was fixing shoes and she picked up the lamp 'to do what she was going to do' and 'it bursted and flew all over her."

"Other witnesses who were present in the home testified as to the events after the burning and as to the suffering of the injured.

"The contention of the defendants was that the proof did not show that the lamp had exploded and that if it did explode such explosion was due to the fact that the lamp had no chimney and the wick was too small and this negligent use of the lamp, coupled with the fact that it was sitting in front of the fire, which would tend to heat the oil, had caused whatever trouble occurred."

The judgment was for the defendant, and the plaintiff appealed. There are 12 exceptions, but not so many questions.

I. Dr. Vilbrandt, an expert witness for the plaintiff, testified that while the flash test was above 100 degrees F., as required by the South Carolina statute, still there were substances in the oil that made it unsafe for use. The defendant objected to the testimony on the ground that the statutes of this state had fixed the standard of safety at 100 degrees F. and when the oil complained of showed a flash over 100 degrees F. they had fully complied with the law fixing a standard of safety, and that evidence to the contrary was inadmissible. The trial Judge excluded the testimony and charged the jury that, if the oil in question had a flash of more than 100 degrees, it had complied with the law and was not responsible for an explosion.

The Statute (Civ. Code, 1922) relied upon (taken from appellant's argument) is as follows:

"Sec. 2. The following standards shall be enforced under the provisions of the act:   (a) The flash test of illuminating oils shall be not less than 100 degrees Fahrenheit, as tested by the Elliott method closed cup—according to directions prepared by the commissioner of agriculture, commerce and industries.   (b) All illuminating oils shall show not more than six per cent. by weight of residue remaining undistilled at 570 degrees Fahrenheit.   (c) Photometic tests of illuminating oils must show a steady flame of good quality and good illuminating power."

That statute refers to three points only, and leaves other qualities and other defects where they were before.   To illustrate:   A statute that fixes a speed limit for automobiles on a public highway does not allow an automobilist to negligently or willfully run down a pedestrian, or injure another, provided he does not exceed the speed limit.   The testimony was competent and it was error to strike it out. The charge that made the flash test the sole test was error.

II. Dr. A. C. Summers, a witness for the defendant, who was in charge of the state laboratory under the department of agriculture, was examined as to an analysis of the oil in question.   The plaintiff undertook to show, on the cross-examination, that the deparmtent had made another analysis that was erroneous.   The effort was to show that the department had declared another sample of oil free from gasoline, that did contain gasoline.   The question is:   Can a party show that an expert witness put up by the other side has made mistakes in other cases of the same sort?

We have not been cited to any authority from this state, directly on the subject.   The authorities in other jurisdictions are conflicting.   We must, therefore, follow those authorities that are more in accord with the general principles of law.   The evidence is allowed in 11 Ruling Case

Law, 646, and *Hoag v. Wright,* 174 N. Y., 36; 66 N. E., 579; 63 L. R. A., 163.

If it be true that the expert is a blunderer, then his testimony is of little or no value. It is manifest that it may be a matter of supreme importance to show the accuracy of the expert. To illustrate: A man is on trial for murder, by poisoning. An expert is put on the stand who testifies that he had analyzed the stomach of the deceased, and found strychnine. The sole question in the case may be: Did the stomach contain strychnine? There is only one stomach to be examined, and that in the possession of the prosecution. The defendant is shut up to an impeachment of that expert witness. A chemist's life is often in his laboratory, and probably he has no reputation, either good or bad. The only way then is to show his inaccuracy, and the only way to show that is to show that he has made mistakes, it may be time and again. It is true that in collateral matters the witness cannot be contradicted, but the accuracy of his analysis may be the only issue in the case, and is not collateral. A. testifies that he saw B. shoot C. The shooting was across the street. It would work a great hardship if the defendant could not show that A. did not know B. at all, or could not recognize him across the street. The best and most conclusive way to show it is by showing that A. undertook to identify B. and failed to do it. The effectiveness is beyond question. The only question is: Is there a rule of law that works this great injustice? The answer, is: There is no such rule in this state.

III. The presiding Judge charged the jury that the plaintiff in this case could not rely on a breach of warranty. In so holding, he was correct. This was an action sounding in tort and not in contract.

The judgment is reversed and a new trial ordered.

MR. CHIEF JUSTICE GARY and MR. JUSTICE WATTS concur.

Mr. Justice Marion concurs in result.

Mr. Justice Cothran dissents.

Mr. Justice Marion (concurring specially) : I concur in the conclusion of the majority opinion upon the ground that the charge of the trial Judge to the effect that "if you come to the conclusion from the evidence in this case, that the defendant Standard Oil Company sold the oil in question, and that the oil upon flash test as prescribed by the statute, came up to 100 degrees Fahrenheit or more, then this defendant is not guilty of negligence in making such sale," was erroneous.   Upon this question I find myself unable to subscribe to the proposition so ingeniously and ably upheld by Mr. Justice Cothran in his dissenting opinion.   Upon the issue of negligence in an action of this character I am clearly of the opinion that proof of compliance with the standard prescribed by statute "in so far as inflammability of the oil is concerned" may not soundly be held to raise an irrebuttable legal presumption of due care in that regard.

For that reason I concur in the result.

Mr. Justice Cothran (dissenting) : The opinion of Mr. Justice Fraser contains a sufficient preliminary statement of this appeal.   Not concurring in his conclusions of law, I propose to give the grounds of my dissent.

The only two points discussed in the leading opinion are : (1) The alleged exclusion of certain testimony of Dr. Vilbrandt, a chemist, and an expert witness for the plaintiff; and (2) the alleged exclusion of certain testimony tending to show that the agricultural department had made another analysis of a different lot of oil, and had declared it free of gasoline, when in fact it did contain gasoline.

To obtain a clearer apprehension, perhaps, of the issues involved in this appeal, it may be stated :

Gasoline and kerosene are both the products of the refining of crude oil; gasoline is more refined, much more volatile, and hence more highly inflammable and explosive

than kerosene; exposed to the air, without the application
of any heat at all, it will give off vapors or gases, which
coming in contact with flame, will instantly ignite and ex-
plode; kerosene, being less refined and less volatile, will not
give off such vapors or gases unless heat is applied; the
two oils will blend when combined and form a homogeneous
fluid, the danger of which, from untimely ignition or ex-
plosion, depends upon the excess, above the danger point, of
gasoline in the mixture. The more gasoline contained in
the mixture the less heat is required to produce a liberation
of the vapors or gases, which in the presence of flame will
ignite and explode. Accordingly a test has been devised,
known as the "Elliott closed-cup test or method" (approved
by our statute), by which the temperature at which a given
oil or mixture will give off those explosive vapors or gases,
and ignite or explode upon the application of flame, is de-
termined. This degree of temperature is technically called
the "flash point." As better expressed by Dr. Allen in his
work on Commercial Organic Analysis (4th Ed.) Vol. 3,
p. 120:

"The temperature at which a sample of oil commences to
give off sensible quantities of inflammable vapor is techni-
cally called the 'flashing point.' Clearly the lower the
temperature at which an oil flashes, the more dangerous it
must be in transportation, storage and use. The flash
point, or temperature of ignition of the vapor, is greatly
reduced by a small admixture of naphtha."

The element that constitutes danger in kerosene is the
same as that in gasoline. It is conceded that kerosene, in
order to be considered commercially safe, need not be en-
tirely free from this element. This is necessarily implied
from the establishment by statute of the standard. It
provides that if there should be, in the compound, a sufficient
proportion of this dangerous element to cause a liberation
of the gases and a consequent ignition or explosion upon
the application of flame, at a temperature less than 100 de-

grees Fahrenheit, the compound must be condemned; otherwise, it is commercially safe.

It will be observed that the statute contemplates the proposed use of oil for the purposes of illumination, heat, and power, and specific tests are formulated constituting the standard of safety, quality, and value for their respective uses.

Confining the discussion to oil intended for the purposes of illumination, it will be seen that the standard prescribed is directed to three distinct characteristics: (1) Its inflammability; (2) its quality; (3) its illuminating power. Its inflammability is determined by the "flash test"; its quality, by the percentage of residue upon distillation at 570 degrees F.; and its illuminating power, by what is called the "photometic test."

It is manifest, from even a nonexpert view, that Dr. Allen is right when he says, at page 119 of the work above referred to, that the "flash point" test indicates the presence or absence of an objectionable proportion of very volatile constituents, and the distillation test the presence or absence of a large portion of tailings or heavy oil, in no wise connected with the inflammability of the oil. A sample of the oil is distilled, after the unfortunately too familiar process; the condensed vapor which passes through the "worm" into a container represents the available elements for the purposes of illumination; that which is left in the "still" represents the nonavailable elements, and the quality of the oil is determined by the percentage of that residue. The statute provides that if this residue, at a temperature of 570 degrees F., exceeds 6 per cent. in weight, the oil is not fit for illuminating purposes and must be condemned; the implication, on the contrary, is plain that, if the residue is less than 6 per cent., the oil is of a commercially proper quality. It would appear, therefore, that the two tests are separate and distinct; the one for the inflammability of the oil, and the other for its quality.

29—S. C. R., 127.

Coming then to a discussion of the two points upon which the leading opinion decrees a reversal of the judgment in favor of the defendant:

As to the first point: The leading opinion states:

"Dr. Vilbrandt, an expert witness for the plaintiff, testified that while the flash test was above 100 degrees F., as required by the South Carolina statute, still there were substances in the oil that made it unsafe for use."

I do not understand that he so testified. He had made no analysis of the oil in question, and could not therefore have given any such testimony; he testified solely upon the analysis which the department had made, and which the plaintiff had offered in evidence. The purpose and drift of his testimony was to show that the lawmakers of South Carolina did not know what they were doing when they established the standard of a safe oil. The gist of his testimony was this:

"It is not scientifically correct to base any statement correctly on the flash point alone, since a mixture can be created that will be above the legal flash point as coming in the present day standard. Distillation test is the most important one of present-day practice, together with the flash point. * * * Distillation, and not flash point, should determine the presence of gasoline in kerosene, and not the flash point. It depends more on distillation than on the other two methods. Q. Doctor, did you testify that oil that flashed at 108, having 38 per cent. of the first distillate up to 200, would not be safe? A. I did. Q. Why? A. Because there is too large a proportion of the initial fraction volatile in the oil."

As a matter of fact, this testimony appears in the cross-examination of Dr. Vilbrandt by counsel for the defendant, and appears to have been admitted without objection or ruling. The record sets forth his testimony as objected to, purporting to be that which was stricken out by the Court at the end of the evidence. It shows that in answer to a

question the witness stated that, if the flash point was 110 and the first distillate ran 38 per cent.:

"I would be suspicious of the kerosene, because the first distillate is high. It runs 38 per cent. For ordinary kerosene it should run about 25 per cent."

The question and answer were then withdrawn by the counsel for the plaintiff, and the witness was asked:

"Would that or not, that distillate, 175 to 200, would that or not indicate the presence of gasoline or some other high explosive?"

To this question the witness answered:

"Regarding the question about explosive materials— explosive materials are so varied that I would not answer that question yes or no."

So that it appears either that the testimony, the exclusion of which is now assigned as error, was received without objection, or was not given at all.

Furthermore, the exception No. 1, attempting to raise the question, is plainly in violation of rule 5, par. 6, in that the testimony objected to is not set forth, and the Court is left to an examination of the record to ascertain what as above indicated is a matter of doubt. But assuming that Dr. Vilbrandt testified as above set forth, that it was ruled inadmissible by the Court, and that due exception has been taken to such ruling, I think that its inadmissibility is manifest.

The effect of the testimony, if admitted and accepted as true, would be to set up a different standard of safety from that fixed by the statute. In his opinion the test of safety, that is freedom from the vice of inflammability, is the result of the first distillate. In the statute the test is the result of the Elliott method of determining the "flash point." In his opinion the standard of safety fixed by the statute is no standard at all. As already indicated, it seems clear from the terms of the statute that the "flash point" test

alone determines the inflammability of the oil, and the distillation test, its quality.

But regardless of the correctness or incorrectness of Dr. Vilbrandt's conception of what the test of safety ought to be, that matter has been foreclosed by legislative action, in the exercise of police power, of which in a proper case the legislative power is the final arbiter.

In *Sharkey v. Skilton,* 83 Conn., 503; 77 Atl., 950, it is said:

"But it is competent for legislative authority to determine that a defined course of conduct under given conditions is an essential requisite of ordinary care under those conditions, * * * thus establishing an arbitrary standard for the test of conduct as related to due care, and this has been done repeatedly."

The Supreme Court of the United States has said in the case of *Waters-Pierce Oil Co. v. Deselms,* 212 U. S., 159; 29 Sup. Ct., 270; 53 L. Ed., 453:

"But we think the Court * * * was clearly right in deciding that, as the subject was within the police power of the state, it was not within the province of the judiciary to disregard the statute and treat it as void upon the theory that the Legislature had acted unwisely in fixing the standard which the statute prescribed."

If the testimony of Dr. Vilbrandt be held admissible, the jury had the right to act upon it in their verdict, and in confirming that verdict is it not manifest that it would have been "in the province of the judiciary to disregard the statute and treat it as void, upon the theory that the Legislature had acted unwisely in fixing the standard which the statute prescribed?" Or, shall Dr. Vilbrandt by his *ipse dixit,* override the statute law of the state, and exercise greater power than the judiciary possesses? He says that although the oil may show a flash point of 110 degrees, there still may be in the compound enough gasoline to render it liable to explosion; the statute declares that that is legally impossible.

In the Waters-Pierce Case, the situation was reversed; there the plaintiff had a verdict for damages on account of the explosion of oil, admittedly mixed with gasoline. The defendant was attacking the standard of safety fixed by the statute, and the above remark of the Court was made in that connection. If the defendant should be charged with liability for not complying with the standard, is it not fair that it should be exculpated if it does comply?

It is worthy of remark that the criticism of Dr. Vilbrandt is based upon the result of the first distillate. It appears from the analysis that there were several distillations made, fractional distillations as they are called, one at 175 to 200 degrees Centigrade, which showed a residue of 38 per cent., another at 225 to 250 degrees C., 39 per cent., another at 150 to 300 degrees C., 95 per cent. (which surely must be a typographical error), and the last at 300 degrees C. (570 degrees F.), 3.5 cent. His comment is that the first distillate, 175 to 200 degrees C., 38 per. cent., runs too high; that "for ordinary kerosene it should run about 25 per cent." The test fixed by the statute is that the distillation at 570 F. (300 C.) should not exceed 6 per cent. of the weight. The analysis showed 3.5 per cent. The law makes no other provision for any other distillation test than the one at 570 degrees F. He would condemn the oil if an intermediate distillation, in his opinion, ran so high as to make him suspicious of it, when the distillation prescribed by the statute shows a result within the standard fixed, with a margin.

The real point in the case is whether or not the Circuit Judge erred in his interpretation of the law as disclosed in the allowance of the defendant's sixth request to charge, which was as follows:

"If you come to the conclusion, from the evidence in this case, that the defendant Standard Oil Company sold the oil in question, and that that oil upon the flash test as prescribed by the statute  *  *  *  came up to 100 degrees

Fahrenheit, or more, then this defendant is not guilty of negligence in making such sale."

Perhaps more simply stated, the contention of the defendant is that, so far as inflammability is concerned, if the oil came up to the standard fixed by statute, the defendant had the right to sell it; otherwise not; and, as a necessary corollary of that right, it cannot, under the circumstances stated, be adjudged guilty of negligence.

From the literature and decided cases that I have had access to in the study of this interesting case, I think that it may safely be said that practically all the states have realized the necessity of fixing a standard of safety within which commercial oil may be sold; they vary considerably in the "flash point"; but if they did not intend to permit the sale when the oil came up to the standard, their action is a delusion and a snare to those who deal in it. The legislative action can only mean that, if the oil in question responds to the specified test, there arises a legal presumption, irrebuttable, that it is not within the prohibited zone, so far as inflammability is concerned.

It will be observed that in the complaint the deficiency of the compound from which the lamp was filled is alleged to have been such an improper blending of gasoline and kerosene as to cause an explosion, an allegation of its inflammability beyond the point of safety. That, of course, may have been established either by showing that it did not come up to the statutory standard, or that, if it apparently did so, it nevertheless contained an element of dangerous explosiveness, the existence of which would establish the inaccuracy of the analysis. But once concede the accuracy of the analysis, the hypothesis upon which the request is based, it follows as a legally conclusive deduction that the compound was not within the prohibited zone of inflammability.

It is a misconception to assume that the Circuit Judge ever intended to hold that if, as a matter of fact, the oil was mixed with a dangerous element, the defendant should be

excused by offering testimony that it had complied with the statute.    He held over and over again that such was not the case:

"I do not conceive that there has been any element of this chemist's testimony so far, or any decision which has been cited, which would eliminate his testimony as to the effect of a mixture, because I conceive that is competent here."

"I propose to allow you to prove whether or not there was any mixture as to the contents, whether gasoline and kerosene were mixed."

"I will admit—when you undertake to show  *  *  * that there was any mixture of gasoline."

"I have already ruled if this stuff that was analyzed here was within the requirements of the state law, that would end the inquiry."

"You can go ahead and show whether or not there was any mixture which made the thing dangerous."

"Mr. Graydon: If your Honor holds that they can sell a kerosene that flashes at over 100 and has a residue of not over 6 and in doing that they can put in that same thing a dangerous explosive  *  *  *  that they can do that and then avoid all liability because they are—

"The Court: I am not holding that."

In his charge to the jury, at the request of plaintiff's counsel, the Circuit Judge charged:

"If the jury find from the testimony that the defendant sold kerosene oil which had a dangerous mixture in it, which caused an explosion which injured the plaintiff, then it would be the duty of the jury to find a verdict in favor of the plaintiff."

It is perfectly clear that the Circuit Judge intended to, and did hold, that the analysis was not conclusive of the fact that the oil came up to the legal standard; the correctness of the analysis, like every other issue of fact in the case, was for the jury; that if it did not come up to the

standard, and contained a deleterious element of inflammability which produced the explosion, the defendant was liable; but that if it did come up to the legal standard, the defendant was not liable, and could not be made so by the testimony of a chemist who may have differed with the Legislature upon the reliability of the standard.

Suppose that the defendant, before offering a gallon of its kerosene oil for sale, had submitted a sample of it to the department for analysis, and had received a report, shown to be accurate, that the flash point was 110 degrees and the residue upon distillation at a temperature of 570 degrees Fahrenheit was 3.5 per cent. of its weight, would the defendant not have been justified, and therefore not negligent, in offering it for sale? And would it be just to admit the evidence of experts that the standard fixed by the law was an improper one?

It is undeniably true that, when a statute prescribes certain precautions to be taken ·in order to prevent an accident, those precautions are not intended to be exclusive of all other precautions which the exigencies of the particular situation may require, in the exercise of ordinary care. For instance, the statute requires every locomotive engine to be equipped with a bell weighing at least 30 pounds and a whistle; that upon approaching a crossing the bell shall be rung of the whistle blown continuously for 500 yards, and until the engine shall have passed over the crossing. The location of a particular crossing may be such as to require other precautions in addition to the statutory signals; as where it is in the midst of a populous community, or near a schoolhouse where children are continually passing, or where it is concealed by obstructions from the engineer's view, or where the condition of the weather, fogginess, rainstorm, snowstorm or the like would require both signals, and perhaps others. 2 Thomp. Neg., § 1555. But, if there are no such circumstances requiring additional precautions, clearly the engineer should be held free from

blame if he does what the law requires him to do. Would the Court under these circumstances admit the testimony of an expert that the statute prescribed inadequate precautions; that the distance should have been fixed at 600 yards instead of 500; that it should have required both the ringing of the bell and the blowing of the whistle; and that the bell should have weighed 40 pounds instead of 30? Or if a statute prescribed the percentage of morphine or strychnine a medicinal compound should contain, would it be just to hold a physician, a druggist, or the manufacturer for the alleged consequences, upon expert testimony that the standard was erroneous, in the absence of other circumstances?

It has been decided by the Supreme Court of the United States, in the National Prohibition Cases, 253 U. S., 350; 40 Sup. Ct., 486, 588; 64 L. Ed., 946, that Congress has the power to prescribe the limit of alcoholic content in a beverage, beyond which it shall be deemed "intoxicating liquor" within the Volstead Prohibition Act (U. S. Comp. St. Ann. Supp., 1923, § 10138½ et seq). Should a manufacturer of a beverage within the statutory limit be held responsible for the intoxication of a consumer, or a retailer be convicted of selling intoxicating liquor, upon the testimony of an expert that as a matter of fact a beverage containing one-half of 1 per cent. alcohol was intoxicating?

The liability of a manufacturer to a purchaser of his manufactured article in the market, either directly or indirectly, is based upon the manufacturer's duty to the public and its breach through negligence. In the absence of circumstances requiring additional precautions, the manufacturer complies with his duty in putting upon the market an article which conforms to the standard required by law. If he should put upon the market an article which does not conform to such standard, he would be guilty of negligence *per se;* it would seem to follow that the reverse should be true, giving him the benefit of due care *per se,* which presumption should protect him in the absence of

circumstances demanding greater care, the burden of showing which is upon the plaintiff.

The point I insist upon in the case at bar is that, if there are no circumstances tending to show that the kerosene in question did not come up to the statutory standard of safety, it contained some other dangerous element, or that the circumstances did not justify the manufacturer in relying upon this standard, the manufacturer was justified in putting the article which did conform to the standard in the channels of commerce. All that the testimony of Dr. Vilbrandt tends to prove is that the statutory standard was not sufficient and this he should not be allowed to attempt. There was not a single circumstance in the case which justified an attack upon the legal standard of safety, and not one tending to show that the defendant in putting the oil upon the market was not justified in relying upon the analysis which came up to that standard. The Waters-Pierce Case, *supra,* holds that the defendant could not attack the legal standard, and I see no reason why the plaintiff should be allowed to do so.

The statute law, found in Volume 3, Code of Laws, 1922, p. 1048, provides: "That all gasoline, * * * kerosene * * * used for * * * power, illuminating or heating purposes, shall be subjected to inspection and test to determine their safety and value for power, illuminating or heating purposes;" that all manufacturers, etc., shall file a certain statement as to doing business in the state and that the oil they propose to sell "will comply with the requirements of this article"; that at any time the department may collect samples of the oil offered for sale and "have the same tested or analyzed"; that the inspection shall be under the direction of the department; that the commissioner shall make the necessary rules, employ proper help, "and enforce standards as to safety, etc," when not in conflict with the provisions of the act.

It then prescribes the standards which are to be enforced. As to illuminating oil the standard in reference to safety is that the flash test shall be not less than 100 degrees Fahrenheit. It further provides that upon complaint being made the commissioner shall cause a sample of the oil to be procured and thoroughly analyzed as to safety, etc., evidently implying that it is to be done in compliance with the mandate "to enforce standards" already specified; and if it shall be found that the oil is unsafe or of inferior quality, according to the standards prescribed, its sale shall be forbidden; conveying the implication that, if it should conform to the standards, its sale should be permitted.

How is it possible, then, to construe an act done in conformity with the law, by the permission of the administrators of the law, to be unlawful, negligent?

As to the second point: The leading opinion states:

"Dr. A. C. Summers, a witness for the defendant, who was in charge of the state laboratory, under the department of agriculture, was examined as to an analysis of the oil in question. The plaintiff undertook to show, on cross-examination, that *the department* had made another analysis that was erroneous. The effort was to show that *the department* had declared another sample of oil free from gasoline, that did contain gasoline. The question is: *Can a party show that an expert witness put up by the other side has made mistakes in other cases of the same sort?*" (Emphasis added.)

It then proceeds to demonstrate and illustrate what is practically a self-evident proposition, that such evidence is admissible. That, however, was not at all the proposition presented to the Court. Assuming, what may be read between the lines, that after the analysis of March 31, 1921, had been made at the instigation of the plaintiff, showing a flash point of the particular oil from which the lamp was filled, of 110 degrees, and a residue upon distillation at 570 degrees Fahrenheit (300 degrees Centigrade) of 3.5 per

cent. (in both of which particulars the analysis showed compliance with the statutory standard, with comfortable margins), counsel for the plaintiff, dissatisfied with what he had procured, dug a pit for the department by loading a sample of other oil with 15 to 20 per cent. of gasoline and submitting it to the department for analysis and that the analysis dated June 6, 1921, showed a flash point of 108 degrees and residue upon distillation of 3.5 per cent. indicating no gasoline.    It is difficult to see how this evidence tended to discredit the expert character or accurate work of Dr. Summers, who did not make either the analysis of March 31st or that of June 6th.

Again, if this evidence was intended to disparage the accuracy of the analysis of March 31st, it was inadmissible for the reason that the plaintiff had introduced that analysis in evidence and should not be heard in disparagement of his own evidence.

Furthermore, Dr. Summers was being examined upon the written report of the analysis of June 6th, which he had not prepared, and was speaking from it, which showed no gasoline, or at least was up to standard.    It is difficult to see how this analysis tended to discredit either his expert character or accuracy.

Assuming that some one in the department had made a mistake in this doctored sample, that surely could not be urged to the discredit of the entire department or disparage the character or accuracy of one who had not made the mistake.

I am satisfied that the record discloses no reversible error and that the verdict was right and should stand.