13892

HOUSAND v. ARMOUR & CO. *ET AL.*

(175 S. E., 516)

Messrs. *H. H. Woodward* and *W. C. Kirk,* for appellant,

Mr. *W. O. Godwin,* for appellants,

Messrs. *G. Lloyd Ford* and *John S. Sikes,* for respondent,

July 26, 1934.

The opinion of the Court was delivered by MR. W. C. COTHRAN, ACTING ASSOCIATE JUSTICE.

The defendant, as named, Armour & Co., is a corporation of the State of Maine, has no agents in this State, and has not complied with the requirements of the law relative to the domestication of foreign corporations. The defendants, W. G. Moore and J. Austin Powell, are residents of Horry County. It appears that Moore is the owner of the store of which Powell is the manager. It developed in the trial that

there was another corporation known as Armour & Co., which is a corporation of the State of Illinois, has officers and agents in this State, does business in this State, and has complied with the law relative to domestication of foreign corporations. In order to avoid confusion, Armour & Co., the corporation against which suit was brought, will be referred to as the defendant corporation, and where it becomes necessary to refer to the Illinois corporation, doing business in this State and with agents in this State, the title of Armour and Co. will be used.

The complaint alleges that the defendant corporation is a corporation of the State of Illinois and is engaged in the business of manufacturing meats, foods, canned goods, and other articles, and in selling such foods for public consumption, and, as such, sells its products to the defendant W. G. Moors and others. It further alleges, by way of amendment to the complaint, that W. G. Moore conducts a grocery business in the town of Conway, and that he has a branch store at Loris, of which the defendant J. Austin Powell is the manager. It further alleges: That on September 2, 1932, the plaintiff purchased from J. Austin Powell certain oil sausage from a can, a product of the defendant corporation, and that upon eating same immediately became deathly sick; that her illness was caused by poisonous ptomaines which were present in the sausage and that their presence was, or should have been, known to all three of the defendants; that her illness was caused by the negligence and carelessness of the defendants, their agents and servants, in the "manufacture, canning, packing, compounding and sale and delivery of said sausage." She claimed damages against the three defendants in the sum of $2,995.00.

The answer as filed purported to be the answer of Armour and Co. which, according to the records before us, was not a party to the suit. The answer denied the material allegations of the complaint, alleging that it was a corporation of the State of Illinois, and that at all times it "exercised

every possible care and caution" (omitting to state in what respects it so acted), charged negligence on the part of the plaintiff and the other defendants, and denied that the sausage or can containing same was its product. Moore and Powell answered by general denial.

There was a verdict for the plaintiff against all three defendants in the sum of $400.00 and they appealed to this Court from the judgment entered thereon.

Before discussing the exceptions in full, we wish to say that this cause appears to be about as thoroughly confused as any we have yet encountered. Armour & Co., the named defendant, appears by its charter to be a corporation of the State of Maine. It does no business in this State, has no agent in this State, and hence it was never served with the summons and complaint. The agent served was the agent of Armour and Co., a corporation of the State of Illinois. Armour and Co., Illinois corporation, filed an answer, although it was not a party to the suit, and entered upon the trial with the result that a verdict is rendered against a corporation which was never served because of participation in the suit by a corporation which was not a party; a most unusual situation, to say the least. Our decision to dispose of this appeal upon other grounds will render unnecessary any effort on our part to untie this Gordian knot.

A further statement of some pertinent facts appears necessary. Moore ordered five 50-pound cans of sausage from the Wilmington, N. C., office of the defendant corporation, and this shipment was made to him in August. On August 25th one can of this shipment was sent to his branch store at Loris. On the face of the can there appeared in large letters the following words: "Perishable, Keep Under Refrigeration." The can was placed upon the counter, opened, and the sausage sold to customers as they wished. The weather was hot, the thermometer registering above 90 degrees, and no effort was made to keep the can cool or refrigerated. Sales were made from the can from August

25th to September 2nd; the sausage being removed from the can by means of an old fork which hung from the counter. More than half of the contents of the can had been sold before the plaintiff made her purchase, and no report of illness had been received prior thereto. As to the other four cans purchased by Moore no reference whatsoever is made.

On September 8th Mr. J. S. Sikes, attorney for plaintiff, went to Powell's store and took possession of the can of sausage. He delivered it to one Dr. Page, the proprietor of a drug store, and Dr. Page testified that he fastened the lid down tight, wrapped a towel over the top, tied a string around it and put the can in his Frigidaire. The can, according to his testimony, remained in the Frigidaire from September 8th until the following March when he took it to Columbia and delivered it to the Chemical Department of the University of South Carolina, leaving it with Mr. Paul Wimberly for analysis.

When Wimberly was on the stand many objections were made to his testimony, and at the conclusion of it a motion was made to strike it all from the record. The motion was refused, and by proper exceptions those matters are brought to our attention.

The entire testimony of Wimberly should not have been stricken out as there were competent portions thereof; especially his chemical analysis which was admitted without objection. The grounds upon which it was sought to strike his entire testimony off the record will be more fully considered hereafter. The specific objections to his testimony are of more importance.

Wimberly received his B.S. degree from the Georgia School of Technology in Atlanta, and gave as his employment "Chemical Engineer." He was not a bacteriologist. The expert work of analyzing this sausage for bacteria was done by Professor Patterson of the University, and not by Wimberly. Wimberly was a chemist and made the chemical

tests for mineral poisons, reporting that he found none. Then the test for bacteria was undertaken by Professor Patterson, and Wimberly said he assisted him. Professor Patterson, according to Wimberly, prepared cultures and made examinations under a microscope. The assistance given Professor Patterson by Wimberly was such as a nurse would render a surgeon, in his own words, "picking up little things and handing them to him as he wanted them." Wimberly was thereupon permitted to testify that no bacteria could be found, basing his statement upon the fact that he saw none.

A general objection to all tests was made at the time Wimberly was sworn upon the ground that within the five or six months from the time the sausage was consumed by the plaintiff to the time of examination changes could take place in the sausage and chemical reactions would occur which would render the examination of no practical value. There was a further objection made upon the ground that a preliminary examination of Wimberly showed that he was not an expert in bacteriology, and hence his testimony would be irrelevant.

We think the objection to his testmony could be sustained on the two grounds above set out, although there was no objection to his chemical analysis which showed the absence of metallic poisons. To say that meat kept in a Frigidaire for six months will, by analysis, prove its contents six months previously is asking too much of even the much-advertised Frigidaire, especially when the witness testified that chemical changes and reactions were likely to occur.

Wimberly, admittedly not an expert in bacteriology, was permitted to relate the findings of the bacteriological analysis as made by Professor Patterson. He was obliged to have obtained his information from Professor Patterson, as there was nothing in the record to show that he obtained it in any other way. His testimony that with the naked eye he saw no bacteria is unworthy of consideration. Professor Patterson made all the tests, including the microscopic examina-

tions, while Wimberly looked on, serving in the same capacity as a nurse to a surgeon. Professor Patterson made all the tests, yet was not called upon to testify; no reason being given or excuse offered for his absence.

There was no objection to the testimony of Wimberly as a chemist, and in that capacity he testified as to the presence of ptomaines in the meat. Applying a legal analysis to his testimony even as he applied a chemical analysis to the meat, we find no more evidence to warrant a verdict against the defendants than he could find evidence of mineral poisons. He says that he found an oxidizing agent in the meat, and, therefore, concluded that ptomaines entered the meat before it was packed or shipped. He failed to find the ptomaines in the meat, and he failed to find a definite oxidizing agent or that the same was poisonous. He said that the most common oxidizing agents were air and water, certanly nonpoisonous. He further said that the meat was free from any trace of alkaloids. As the dictionaries and the medical authorities all define ptomaines as an alkaloid poison originating in dead or decaying matter, his failure to find any trace of alkaloids must negative his supposition that poisonous ptomaines were actually in the meat.

The error, therefore, in permitting Wimberly to testify as an expert as to the bacteriological tests and in relating the findings in that test which he evidently received from Professor Patterson would warrant a reversal of the judgment in so far as the defendant corporation is concerned. That an expert must have peculiar skill to form an opinion upon the subject under investigation is held in *Robertson v. Insurance Co.*, 37 Ga. App., 703, 141 S. E., 504. That it is a matter of supreme importance to show the accuracy of the expert is held in *Williams v. Standard Oil Co.*, 127 S. C., 430, 121 S. E., 363. That one, even though an expert, cannot testify from records made by others, is declared in the very recent case of *Stack v. Insurance Co.* (S. C.), 174 S. E., 911.

The failure of the testimony of Wimberly to place liability on the packer or on the original seller disposes of the case in so far as the defendant corporation is concerned. We fail to find any evidence of negligence upon which a verdict against it can be predicated in the present state of the pleadings and proof, even if Armour & Co., the Maine corporation, be before the Court at all.

As to the defendants Moore and Powell, it appears that the testimony of Wimberly was very much in their favor, and that they have made no objection to it. They do say that even though they may have been guilty of negligence in handling of the sausage in an unsanitary manner by the use of the old fork and by not keeping it refrigerated, yet the proof shows that there was no metallic poisons which would have been caused by the fork, and that Collins, the agent of Armour & Co., told them that it was not necessary to carry out the instructions on the can as to refrigeration. They therefore claim that the only testimony upon which a verdict could be based is against the defendant corporation under Wimberly's testimony, and not against them. In the agreed statement of facts appearing in the transcript these appellants adopt such of the exceptions of the defendant corporation as may be applicable to them. It would appear, however, that their appeal is based entirely upon the effort to place the blame solely upon the defendant corporation and thereby exonerate themselves. They urge that the unsanitary conditions under which the sausage was kept and handled for sale, especially the use of the old fork, cannot be the cause of the illness suffered by the plaintiff, as there was no evidence of metallic poisons. They further contend that when Collins said he did not think it was necessary to keep the meat under refrigeration they were fully justified in failing to do so. The defendant corporation alleges error in admitting the testimony of Collins, but the other defendants say that his testimony was competent. It will therefore

be necessary to consider the question of the admissibility of the testimony of Collins.

Collins was a salesman for Armour & Co., or of Armour and Co. At the time of the giving of his testimony the matter of the two separate corporations had not arisen and the stenographer reported "Armour & Co." in every instance. Collins had nothing to do with the sale to Moore, and was making no investigation of the claim of the plaintiff at the time of the alleged statement. His statement, according to Powell, was made after the trouble arose, and was made at the request of Powell for information as to handling future shipments. In order to protect the public the notice of the necessity for refrigeration was placed on the can, and there is nothing to show that Collins had any right, or authority to advise that the instructions be disregarded. Collins was only a salesman to effect sales between his principal and various merchants, and had no authority, so far as the evidence discloses, to bind his principal beyond those duties. *Edwards v. Coleman,* 139 S. C., 369, 138 S. E., 42. Nor could his statement be considered a part of the *res gestae. Chantry v. Motor Co.,* 156 S. C., 1, 152 S. E., 735. That the declarations of an agent not made within the scope of his authority and not connected with the transaction in question were incompetent is fully sustained by numerous cases from this Court.

Even if Collins' testimony be ruled as competent, did that permit the merchant to disregard the instructions placed upon the can by the manufacturer? We think not. Evidently the merchant considered that he was advised as to both courses to pursue in different ways; to heed the warning as shown on the can and keep the can under refrigeration as containing perishable contents, or of considering the warning unnecessary in the opinion of Collins, the salesman. He chose to accept the opinion of Collins and kept the can with its contents in a hot store under admittedly unsanitary conditions. While admission of this testimony was

erroneous as pertaining to the defendant corporation, the other defendants could not complain for the reason that it was brought out by them, was one of the bases of their defense, and was helpful to them rather than prejudicial.

With the admitted proof of the unsanitary condition in which the sausage was exposed for sale and with the further proof that it was liable to be infested with harmful germs during that period, together with the admitted fact that the bacteria might have disappeared during the six months the can was kept in the Frigidaire, there was created a state of facts as to the cause of the illness of the plaintiff which was properly submitted to the jury as to the liability of the defendants Moore and Powell.

When Collins was on the stand the attorney for the plaintiff asked him if he had not made this statement, "Don't put it out on cold storage, but put it out there and sell the damn stuff?" He denied making any such statement, and there was no proof that he had done so. During the arguments to the jury by the attorney for the plaintiff and by the attorney for the local defendants, they both stated as a proven fact that the witness Collins had made the statement set forth above. The attorneys for the defendant corporation objected to that line of argument and requested the Court to instruct the jury to disregard it, but the request was refused. Error is predicated upon this refusal.

If any of the testimony of Collins in regard to disregarding the instructions as to the proper preservation of the sausage be competent, which we hold was not, we would still be unable to see how the attorneys were permitted to argue to the jury as true the statement as to selling the "damn stuff," which was totally unproven. To hear attorneys ask a witness if he had not said something which is most damaging to his side of the case, and, upon receiving a flat denial of ever having made such a statement, to permit the attorney over the objections to argue to the jury as though the damaging statement were true, is not conducive to that

time-honored guarantee of a fair and impartial trial which is the mainstay of Courts of justice in this State. The objection to the argument should have been sustained. The error in this ruling, however, could not inure to the benefit of the local defendants for the reason that their attorney was one of the offending parties and could not complain of the ruling.

A most interesting case on this subject, with full annotations, will be found in (Burkhardt v. Armour & Co., 115 Conn., 249, 161 A., 385) 90 A. L. R., 1260. It would appear from this citation that in those states which have not adopted the Uniform Sales Law, a merchant is not liable for damages from the sale of defective foods packed by a reliable packer when the food is sold in the original container and for immediate consumption. This condition,. however, does not prevail in the case now before us.

The authorities cited by counsel in this cause, together with other authorities, have been carefully examined in an effort to reach a correct decision in this case, and the result is that under the proof before us the judgment against the defendant corporation must be reversed, with directions to enter a judgment in its favor under Rule 27, and that the judgment against the local defendants must be affirmed.

MR. CHIEF JUSTICE BLEASE and MESSRS. JUSTICES STABLER, CARTER, and BONHAM concur.