## Great Atlantic & Pacific Tea Co. v. Eiseman.

(Decided Feb. 19, 1935.)

(As Modified on Denial of Rehearing May 21, 1935.)

DAVID R. CASTLEMAN and CARROLL & McELWAIN for appellant.

BLAKEY, DAVIS & LEWIS, A. J. DEINDOERFER and GEORGE C. LONG for appellee.

OPINION OF THE COURT BY JUDGE RICHARDSON—Affirming.

This is an action by a customer of a retail dealer to recover of him damages for the ill effects to her health, on account of the sale of deleterious food sold her for her own use. Her cause of action is predicated on negligence, and not on an implied warranty. The defenses are a traverse and contributory negligence.

The developed facts are: Nora E. Eiseman with her two sons resided at 638 South Forty-third street, Louisville, Ky. The Great Atlantc & Pacific Tea Com-

pany had engaged for four or five years at Cecil and Broadway streets, later at Nineteenth and Broadway, in retailing food for domestic use. Mrs. Eiseman was one of its customers. It was her habit to call by phone its place of business and give orders for such articles of food as she desired for use at her home. One of her sons was employed by the Louisville Gas & Electric Company, and when returning at the close of his day's work, at her direction, he would call for and receive at the store of the Great Atlantic & Pacific Tea Company the articles which she had ordered. On August 31, 1932, she called its store and gave it a list of groceries she desired, including a "spring chicken." Her son, on his way home from work, about 5 o'clock p. m., in company with Thad D. Lewis, received at its store the articles which his mother had previously ordered, including the chicken. It had been dressed, split open in the back, and its entrails removed, leaving the head and feet. On receiving it, she cut the legs, wings, and breast "in regular frying style"; washed it with strong salt water; dipped it in flour; placed it in a skillet of hot lard, and fried it. In so handling it, she observed nothing indicating it was spoiled or unfit for food. She discovered no odor indicating either. In cutting it apart, the drum stick and the short thigh were one piece. Within a few minutes after it was fried, she began to eat her supper; she ate one leg; it tasted alright; she began to eat the second leg, and discovered it was tainted. She quit eating it and began to eat a portion of the breast when she discerned it was spoiled. Thereupon, she gave the remainder to her dog, and it is claimed the dog died. Her supper was bread, butter, iced tea, and the chicken; her noon lunch was toast and iced tea; her breakfast was "a cup of black coffee and a small piece of toast." All of this food had been purchased at the store of the Atlantic & Pacific Company. At about 10 o'clock following the hour of her supper at 6, she became "deathly sick at her stomach"; began to vomit and purge; she was utterly unable to control her bowels. Later one of her sons returned home and rendered her aid. The next morning he called Dr. John W. Kremer and imparted to him information of the circumstances and sickness of his mother. The doctor directed that she be given "sedlitz powders every hour for three hours." It afforded her no relief. At the direction of Dr. Kremer she then "took a bottle of

citrate of magnesia in broken doses.'' On the 2d day of September, Dr. Kremer was called to her home. He discovered that ''she had profuse vomiting, terrible abdominal pains and suffered from her bowels.'' She gave him a history of her trouble, including a description of the food she had eaten durng the day on which she became ill. He requested he be shown ''some of the chicken,'' when he was informed ''it was gone.'' He made seven visits to administer to her, from September 2d to September 8th, giving her the usual remedies administered in such cases, but other complications developed. She continued to vomit and purge until the 3d day of September; she was not able to retain food and he fed her artificial food.

In response to hypothetical questions reflecting and embracing the facts relating to the diet of Mrs. Eiseman on the day she became ill, and her sickness, Drs. Kremer and Trawick agreed in the opinion that her condition and sickness were the proximate result of eating the chicken at her evening meal.

The evidence in favor of the Atlantic & Pacific Company shows that it purchased dressed poultry of N. M. Sanders & Sons, 114-120 West Jefferson street, Louisville, Ky., on definite days during the month of August, 1932. After the same were delivered at its store, they were placed in a tub and packed with ice, and so remained until the delivery was sold. If at the close of the day's business the chickens so delivered were on hand, they were packed in the tub with ice. It endeavored to establish that the chickens delivered by N. M. Sanders & Sons were all sold on the day of the delivery, during the month of August, 1932, and that no chicken was sold and delivered by it to Mrs. Eiseman during the month of August; it was not received by her son at its place of business. As corroborative evidence, it produced the record of the payments of her son's salary, to show that he was engaged during the period of time he had testified he was at home rendering aid to his mother, during her sickness.

The jury, under the instructions of the court, returned a verdict in Mrs. Eiseman's favor of $850. Of this verdict the Atlantic & Pacific Company in its brief makes these statements:

''* * * The jury in effect found that Mrs. Eise-

man did buy the chicken on that date and we suppose that is the law's end of that point. * * *
She owes her doctor One Hundred and Twenty ($120.00) Dollars which the jury specifically awarded him/her, and the other Seven Hundred and Fifty ($750.00) Dollars is not excessive if she is entitled to recover anything.''

These admissions relieve us of the duty of considering the questions whether the chicken was sold and delivered to her, and the verdict is excessive. However, it is strongly argued "there was absolutely no evidence that the chicken was in fact spoiled or unfit for food— unless her later illness includes all other inferences." There was "no attempt whatever made to test the chicken scientifically. No one saw it but her and what was left over after she finished eating she gave to her dog. * * * If this chicken was spoiled this lady had the fullest opportunity and a better opportunity than the defendant to find it out. There can be no doubt about this from her own testimony and it seems to us the law ought not to allow her to hold the defendant responsible for what it did not know, and could not discover when she says herself that she could not discover anything wrong with the chicken in the intimate process of its preparation for cooking and the application of heat in the cooking itself."

It is argued that her right to recover and the company's liability to her are controlled by the "tort theory" recognized by this court in Nehi Bottling Co. v. Thomas, 236 Ky. 684, 33 S. W. (2d) 701; Coca Cola Bottling Co. v. Creech, 245 Ky. 414, 53 S. W. (2d) 745; Liggett & Myers Tobacco Co. v. Rankin, 246 Ky. 65, 54 S. W. (2d) 612; or by the principle adopted in Scruggins v. Jones et al., 207 Ky. 636, 269 S. W. 743, 744, and Walden v. Wheeler, 153 Ky. 181, 154 S. W. 1088, 44 L. R. A. (N. S.) 597.

In Nehi Bottling Co. v. Thomas, in Coca Cola Bottling Co. v. Creech, and in Liggett & Myers Tobacco Co. v. Rankin, damages were sought to be recovered of the manufacturer by a customer of a retailer to whom the manufacturer had sold an article in its original package; we applied the "tort theory."

In Walden v. Wheeler and in Scruggins v. Jones, the retailer had sold his customer the article in its

original package or container. We applied the rule that "where the article is \* \* \* put up by a reputable manufacturer or packer in a sealed can; the exterior of which is in good condition, the retailer is not responsible to his customer for the defective or unwholesome condition of the contents, unless and except at the time of the sale he expressly warrants the same to be free from defects." Whether the principle adhered to in the two last cases is changed by section 2651b-15, Kentucky Statutes, it is unnecessary here to decide. It is sufficient to say that the principles enunciated and applied in all of the above and like cases are inapplicable in the present one. It is governed by a different principle because of the difference in the proven facts.

A vendor of provisions, selected, sold, and delivered by the retailer in a visible condition to the purchaser for his immediate domestic use, under the common (now statutory) law, is bound to know at his peril that the same is sound and wholesome and fit for immediate use; and if it turns out to be unsound and not wholesome, and the purchaser is injured thereby, the seller is liable to him therefor, and the purchaser in so using it does not assume the risk. 3 Blackstone's Commentaries, 165; Fleet v. Hollenkemp, 13 B. Mon. (Ky.) 219, 56 Am. Dec. 563; Kroger Grocery & Baking Co. v. Schneider, 249 Ky. 261, 60 S. W. (2d) 594; Dushane v. Benedict, 120 U. S. 630, 7 S. Ct. 696, 697, 30 L. Ed. 810; Wiedeman v. Keller, 171 Ill. 93, 94 N. E. 210. As this principle applies to sales of articles other than provisions, see Day Pulverizer Co. v. Ruthledge, 238 Ky. 817, 38 S. W. (2d) 949; Balfour-Guthrie & Co. v. L. S. Du Bois Son & Co., 245 Ky. 640, 54 S. W. (2d) 13; J. B. Colt Co. v. Asher, 239 Ky. 235, 39 S. W. (2d) 263, and McBride v. Farmers' Seed Ass'n, 248 Ky. 514, 58 S. W. (2d) 909.

The underlying reason of this rule is that the "tort theory" is entirely inadequate to prevent the selling, and to safeguard and protect the purchasing consumer against the known effects of eating deleterious food. It is a harsh rule. It is more onerous on the seller, and safer for the purchaser, than the "tort theory." It rests on the hypothesis that the seller has a larger experience and so many more facilities and opportunities to observe and ascertain the sound and/or the unsound, unwholesome condition of what he sells than the pur-

chaser; and that public policy and the well-being of public health demand that the former shall assume a warranty-liability to the purchaser for the protection of his health against the consequences proximately caused by a sale of such provision when it is sold and delivered in a visible condition.

This principle was first recognized and stated in 1852, in Fleet v. Hollenkemp, supra. It was recently reiterated and applied in Kroger Grocery & Baking Co. v. Schneider, supra. It was consolidated and crystalized in 1893, in the English Sales of Goods Act (Priest v. Last, 2 K. B. [Eng.] 148; Frost v. Aylesbury Dairy Co., 1 K. B. [Eng.] 608), which has been legislatively adopted in practically every state. Section 2651b-15, Kentucky Statutes, embraces it. Subdivisions 1 and 2 thereof read:

"[1] Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment [whether he be the grower or manufacturer or not], there is an implied warranty that the goods shall be reasonably fit for such purpose.

"[2] Where the goods are bought by description from a seller who deals in goods of that description [whether he be the grower or manufacturer or not], there is an implied warranty that the goods shall be of merchantable quality."

See cases, supra, applying section 2651b-15 to sales of articles other than provisions.

In some jurisdictions the courts apply subdivision 1 to sales of food or drinks sold in the original package or sealed container (Ward v. Great Atlantic & Pacific Tea Co., 231 Mass. 90, 120 N. E. 225, 5 A. L. R. 242); in others they refuse to apply subdivision 1 and apply subdivision 2 to such sales (Ryan v. Progressive Grocery Stores, 255 N. Y. 388, 175 N. E. 105, 74 A. L. R. 339). They agree, however, that subdivision 1 embodies the principle of the common law governing sales by the retailer to the purchasing customer of provision in a visible condition for his immediate dometic use. Rinaldi v. Mohican Co., 225 N. Y. 70, 121 N. E. 471; The St. S. Angelo Toso (C. C. A.) 271 F. 245; Luria Bros.

& Co. v. Klaff, 139 Md. 586, 115 A. 849; Housand v. Armour & Co. et al., 173 S. C. 268, 175 S. E. 516; The St. S. Angelo Toso (D. C.) 265 F. 783; Farrell v. Manhattan Market Co., 198 Mass. 271, 84 N. E. 481, 15 L. R. A. (N. S.) 884, 126 Am. St. Rep. 436, 15 Ann. Cas. 1076; Cook v. Darling, 160 Mich. 475, 125 N. W. 411; Parks v. C. C. Yost Pie Co., 93 Kan. 334, 144 P. 202, L. R. A. 1915C, 179; Nock v. Coca Cola Bottling Works, 102 Pa. Super. 515, 156 A. 537; Burkhardt's Adm'r v. Armour & Co. et al., 115 Conn. 249, 161 A. 385, 90 A. L. R. 1260. Generally, as to the seller's liability, on the theory of implied warranty, for injury due to unfit food, see annotations in 13 A. L. R. 1176, 74 A. L. R. 343, and 90 A. L. R. 1269.

It is proven that the fowl involved in the present case was sold on an order by telephone and delivered in a visible condition for the immediate consumption by the purchaser. Hence, the right of the purchaser, Mrs. Eiseman, to recover and the liability of the seller, the Great Atlantic & Pacific Tea Company, are governed by the common-law rule as it is incarnated in subdivision 1 of the section of the Statutes, supra. To bring her right to a recovery within the principle thereof, it is indispensably essential that she establish that she had communicated to the seller the particular purpose for which she desired it, and that she relied on its skill and judgment in selecting it; she received and immediately or within a reasonable time used it for that purpose, and sustained an injury therefrom.

It is conceded that she had for four or five years so ordered and directed, for her own use, the delivery of provisions, both sealed and in a visible condition, and the Atlantic & Pacific Company had received and filled her orders, knowing the purpose for which the articles were to be used by her.

The evidence amply establishes that she had no opportunity to examine and inspect the fowl here involved before it was delivered; the company had knowledge of the purpose for which it was being sold, and of the place at which, and when, it was to be used, and that she relied upon its skill and judgment in choosing the particular fowl to be delivered for her use as food at her home. See Farrell v. Manhattan Market Co., supra; Gearing v. Berkson, 223 Mass. 257, 111 N. E.

785, L. R. A. 1916D, 1006; Flessher v. Carstens Packing Co., 93 Wash. 48, 160 P. 14; Rinaldi v. Mohican Co., supra; Dushane v. Benedict, supra.

Prior to the enactment of the sales act (section 2651b-15), the rule applicable in such cases, as stated in Dushane v. Benedict, supra, was this:

"When a dealer contracts to sell goods which he deals in, to be applied to a particular purpose, and the buyer has no opportunity to inspect them before delivery, there is an implied warranty that they shall be reasonably fit for that purpose."

In Rodgers v. Niles, 11 Ohio St. 48, 78 Am. Dec. 290, this principle is stated thus:

"Where it is evident that the purchaser did not rely on his own judgment of the quality of the article purchased; the circumstances showing that no examination was possible on his part, or the contract being such as to show that the obligation and responsibility of ascertaining and judging of the quality was thrown upon the vendor, as where he agrees to furnish an article for a particular purpose or use."

In construing the provision of the Ohio Sales Act in Kansas City Bolt & Nut Co. v. Rodd, 220 F. 750, 754, 136 C. C. A. 356, the court held that where the buyer had no opportunity for previous inspection, he "was entitled to rely, and will naturally be presumed to have relied, upon the seller's skill or judgment." To the same effect see Kellogg Bridge Co. v. Hamilton, 110 U. S. 108, 3 S. Ct. 537, 28 L. Ed. 86; The St. S. Angelo Toso (C. C. A.) 271 F. 245. As was said in The St. S. Angelo Toso (D. C.) 265 F. 783, 787:

"There is nothing in the terms of the Sales Act which requires a different rule of evidence to establish reliance upon the skill or judgment of the seller from the rule generally accepted prior to the passage of the act. As the fact of knowledge is shown, and the inference or presumption of reliance may be drawn from that fact and the lack of opportunity of inspection, a warranty of fitness is implied under the statute. See Gillespie Bros. & Co. v. Cheney, 65 L. J. R. Q. B. Div. 552."

It is not doubtful that Mrs. Eiseman is entitled to invoke the doctrine of implied warranty, and have her recovery and the liability of the Atlantic & Pacific Company determined according to it, provided she has established by competent relevant evidence a causal connection between the unwholesome condition of the fowl at the time of its delivery and her illness. Her testimony that it was unfit for food and she first discovered this condition while eating of it is without contradiction. So is her testimony as to the nature, extent, and the effect of her illness, beginning soon after eating of it. Her testimony respecting the kind and quantity of food she had eaten during that day, her independence of ailments and previous good health, is likewise without contradiction. The physicians who appeared as witnesses for her did not merely testify that it was "possible," conceivable," or "reasonable" that her illness resulted from eating of the chicken. On the contrary, they expressed their unequivocal convincing opinions as to the causal connection between her partaking of the chicken and the condition of her health; and thus it was shown that such relation existed. Horn's Adm'r v. Prudential Life Ins. Co., 252 Ky. 137, 65 S. W. (2d) 1017; Phillips' Committee v. Ward's Adm'r, 241 Ky. 25, 43 S. W. (2d) 331; Pac. Mut. Life Ins. Co. v. Cash, 224 Ky. 292, 6 S. W. (2d) 239; American Acc. Co. v. Fidler's Adm'x, 35 S. W. 905, 36 S. W. 528, 18 Ky. Law Rep. 161, and DeFilippo's Case, 284 Mass. 531, 188 N. E. 245. Though other physicians testified contrariwise, the conflicting evidence made an issue to be determined by the jury. Its finding even on conflicting evidence is conclusive.

The parties by their pleadings and offered instructions, and the court by its instructions, have presented the issues on the theory that the seller was under the duty to inspect the fowl, and if it sold it when it was unfit for the purpose for which it was sold, owing to its unwholesome condition, and if it was discoverable by the exercise of the highest degree of care on the seller's part, and it either failed to make the inspection or negligently made it, it was liable to Mrs. Eiseman for the injury resulting to her through the eating of the fowl. However, since the case was tried on the "negligence theory," we shall determine their rights accordingly.

The court's instructions so presenting this theory of the case are not subject to the criticism now urged against them. In reality, Mrs. Eiseman was entitled to have her right to recover and the liability of the Atlantic & Pacific Company determined by the principle of implied warranty as we have stated it. J. B. Colt Co. v. Asher, supra. The instructions are therefore more favorable to it than it was entitled to. But, viewing the case as it was tried on the "tort theory," the insistence that an instruction on contributory negligence was erroneously refused is not authorized by the evidence. Contributory negligence is never presumed, and the burden of proving it was on the Atlantic & Pacific Company. Cox's Adm'r v. Cincinnati, N. O. & T. P. R. Co., 238 Ky. 312, 37 S. W. (2d) 859. With the evidence showing no act, either of commission or omission, of Mrs. Eiseman even tending to establish a failure on her part to exercise ordinary care sooner to discover the unfit condition of the fowl, or she did, or omitted to do, anything to cause its unwholesome condition, it can safely be said there is no evidence authorizing the giving an instruction on contributory negligence. It is superfluous to say it is the rule not to give an instruction, unless it is authorized by the evidence.

The Atlantic & Pacific Company is correct in its contention that the court improperly permitted Dr. Trawick to detail as a part of his testimony the history of the chicken and the illness of Mrs. Eiseman as it was stated to him by her. He was not called to diagnose and determine the cause of her illness to enable him to prescribe the proper remedy, in his view, for treatment. The rule as to such evidence is that the statements of the patient to a physician as to subjective symptoms not made while seeking or receiving medical treatment from the physician are incompetent and should not be admitted as evidence. Hill v. North American Acc. Ins. Co., 185 Ky. 520, 215 S. W. 428; Chesapeake & O. R. Co. v. Hay, 248 Ky. 69, 58 S. W. (2d) 228; Illinois Cent. R. Co. v. Townsend, 206 Ky. 329, 267 S. W. 161.

Clearly, so much of the history of the chicken and her illness to which Dr. Trawick testified was incompetent. An examination of the history as stated by him and a comparison thereof with that detailed by Mrs. Eiseman, her son, and Dr. Kremer disclose that the

114

history as given by them and Dr. Trawick is identical. His testimony in this respect is merely accumulative, and we are unable to conceive that its admission did or could, in any manner or to any extent, influence the jury's verdict. Whilst its admission was improper, in the circumstances, the error of the court in admitting it is harmless, and in no way prejudicial to the substantial rights of the Atlantic & Pacific Company, not alone sufficient to warrant a reversal.

A careful diligent consideration of the record convinces us that a fair and impartial trial has been accorded, and no ground of reversal appears in the record.

Wherefore, the judgment is affirmed.